L. F. STRASSHEIM COMPANY, a Wisconsin corporation, d/b/a Bowling Green Chair Co., Plaintiff-Appellant,

v.

GOLD MEDAL FOLDING FURNITURE COMPANY, a Wisconsin corporation, Defendant-Appellee.

No. 72–1010.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1973.

Decided April 23, 1973.

As Amended on Denial of Rehearing May 18, 1973.

---

Charles B. Cannon, Chicago, Ill., Donald C. Heide, Kenosha, Wis., Lawrence F. Scinto, New York City, for plaintiff-appellant.

James E. Nilles, Milwaukee, Wis., for defendant-appellee.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

The principal question is whether the district court properly found that newly discovered evidence, which plainly required an earlier judgment of patent validity to be set aside, was not sufficient to prove that the patentee had fraudulently concealed the invalidating prior public use of the invention. We accept the district court's credibility determinations but disagree with its appraisal of the legal consequences of the patentee's serious lack of diligence in connection

with its patent application and in responding to relevant pretrial discovery requests. We therefore modify the judgment entered below.

The parties are competing manufacturers of informal furniture, including folding chairs. Defendant is the owner of Patent '816 [1] covering a "non-sag back" feature of a collapsible director's chair, and a design patent [2] describing a rearwardly inclined arm rest assembly. In 1964, plaintiff, admittedly an infringer if the patents are valid, filed a declaratory judgment action alleging invalidity for various reasons, including public use and sale in this country more than one year prior to December 28, 1953, the filing date of the application for the '816 patent. The district court found both patents valid and infringed. After plaintiff filed its notice of appeal, but before argument, the parties entered into a settlement agreement pursuant to which plaintiff paid $15,000 to defendant and the district court's injunction against further infringement remained in effect. Thereafter, the appeal was dismissed and, on October 31, 1968, the district court entered a "final judgment on mandate."

Less than one year later plaintiff filed a motion to reopen on the basis of newly discovered evidence. Plaintiff alleged that defendant was guilty of deliberate fraud and prayed for a new trial, the entry of a new judgment, treble damages, attorneys' fees, and a reference to the United States Attorney and the Commissioner of Patents for appropriate investigation and discipline. The district court reopened the case, allowed further discovery, and, after a second trial, held Patent '816 invalid and set aside the settlement, but otherwise denied the requested relief.

The effect of that decision was to require defendant to refund the settlement payment of $15,000, less its damages for pre-1968 infringement of the design patent, such damages to be determined either by negotiation or an accounting, and to leave in effect the injunction against further infringement of the design patent. Plaintiff appeals, principally contending that the failure to find fraud is clearly erroneous and that, in any event, the relief is inadequate.

I.

December 28, 1953, is the date on which the application for the '816 patent was filed. The evidence adduced at the two trials establishes beyond any question that defendant was selling chairs embodying the "non-sag back" feature prior to December 28, 1952, and that the '816 patent was therefore invalid. Amphenol Corp. v. General Time Corp., 397 F.2d 431, 433 (7th Cir. 1968). A summary of that evidence is a necessary background for an appraisal of the ultimate issues.

The invention was conceived in July, 1951, and "reduced to practice" on September 14, 1951. In October, or possibly earlier in 1951, defendant employed an attorney named Young, now deceased, to file a patent application; he was sent an arm assembly for the No. 35 chair "with new designed back post and canvas back," and his invoice for filing fees was paid. For unexplained reasons, however, Young did not file this application.

In 1952, defendant manufactured chairs to order and also made some sales through distributors, one of whom maintained an inventory in Miami, Florida. An order placed by a customer in Hollywood, Florida, dated November 15, 1952, was filled on November 18, 1952, by taking 30 chairs out of defendant's stock in Miami. Those chairs had the "non-sag back" feature.

1. U.S. Letters Patent No. 2,699,816 on "chair back" issued January 18, 1955, to William L. Gittings and others as assignors to Gold Medal Folding Furniture Company (defendant herein) pursuant to application dated December 28, 1953.

2. U.S. Letters Patent Des. 189,343, issued November 29, 1960, pursuant to application filed December 2, 1958.

On November 17, 1952, defendant sent a letter, enclosing a price list, to about 2,000 customers. The price list was: "Reissued November 15, 1952"; it included prices for 19 different styles of the "No. 35" chair. It also carried a note: "All No. 35 style chairs now regularly equipped with new patented feature—removable covers and non-sag backs."

The November 17, 1952, letter referred to the fact that defendant's "October-Chicago Market was very favorable." Defendant had exhibited at the furniture show in Chicago in October, 1952. It seems likely that the new chair was displayed at that time, but there is no finding or evidence directly on the point. In any event, as a result of defendant's promotional efforts, the non-sag back was described in an issue of a trade publication mailed to about 12,000 subscribers on December 10, 1952, and, necessarily, prepared some time earlier. The new chair was unquestionably on the market before the end of 1952.

In November of 1953, defendant became concerned about the status of its patent protection and wrote directly to the Patent Office to ascertain whether Young had, in fact, filed the application as requested well over a year earlier. A letter from the Patent Office, dated December 4, 1953, brought the distressing news that no application had been filed. On December 7, 1953, a new lawyer was retained with "authority to proceed as necessary to file the application on this matter at the earliest possible date, realizing that it must be done by early January, 1954." [3] At that time, of course, the new chair had been on the market for over a year and it was already too late to obtain patent protection. The newly retained lawyer was able to file by December 28; he testified that he made no attempt to determine the date of the first public offer or sale of the patented device.

At this point we pause to note that in November and December of 1953 defendant's executives either (1) were under the honest, but mistaken, impression that they had introduced the non-sag back chair at the Chicago show in January of 1953, or (2) well knew that their right to obtain patent protection was irretrievably lost and nevertheless sought to create that false impression. There is substantial evidence in the record consistent with either alternative; in the last analysis, however, the factual determination turns on an appraisal of the credibility of the executives who testified, and, skeptical as we may be based on our reading of the cold record, we are not prepared to substitute our judgment for that of the experienced trial judge who heard and saw the witnesses. We do note, however, that there can be no question about the ready availability of the true facts to defendant's executives and attorney when the patent application was filed. The failure to make an appropriate investigation at that time—particularly since the critical importance of filing within one year of the first public offer was obvious to all concerned—reflects an extraordinary lack of diligence to which we consider it appropriate to attach legal significance.

Defendant and its trial counsel also displayed a comparable lack of diligence in responding to discovery requests in advance of the first trial.

In preparing to depose John B. Gittings,[4] plaintiff's counsel requested in June of 1964 that certain documents

---

3. A. 466. Defendant's letter of November 30, 1953, to the Commissioner of Patents had said, in part, "would you *please* give us a prompt answer as according to our knowledge of the law the limitation on the time for filing will soon run out. . . ." A. 463.

4. William D. and John B. Gittings were then the principal officers of the company. They were sons of William L.

Gittings, who was president and presumably the principal owner of the company when the non-sag back chair was invented and patented. The sons were active in the business at that time, but obviously with less responsibility than after the death of their father in May of 1964. Although both were named in the notice of deposition, only John B. was in fact deposed.

be produced for use at the deposition. That request plainly called for the production of the price list reissued on November 15, 1952, the letter to the trade enclosing that list, and the promotional article in the December trade publication.[5] A copy of each of those items was in defendant's possession at that time, and at least the letter enclosing the price list and the article were apparently seen by John B. Gittings shortly before his deposition was taken in Kenosha on July 16. Many other documents were produced in connection with the Kenosha deposition, but none of the items in question was mentioned or brought to the attention of plaintiff's counsel.

The explanation for this important oversight, though somewhat complex, may be summarized briefly. Price lists, advertising copy, and promotional items were normally retained in large scrapbooks, each covering a one-year period. Contrary to customary practice, the overlooked items dated in November and December of 1952, had been improperly placed in the 1953 book. The books for 1951, 1952 and 1953 were made available to plaintiff's counsel, but neither he nor defendant's counsel carefully examined the 1953 book because they apparently accepted the Gittings' representation— whether express or implied is not clear —that the 1953 book would not contain any 1952 material. Anything after December, 1952, would not, of course, have been significant.

The testimony of both of the Gittings brothers is consistent with the defense theory that although John had seen the letter enclosing the reissued price list and the trade publication article when he was rummaging through the documents in his basement in preparation for the Kenosha deposition, he had not realized the significance of the documents because the letter contained no reference to the non-sag back feature and the text of the article referred only to 1953."

This theory also explains defendant's inaccurate response to written interrogatories,[6] as well as the inaccurate testimony given at the first trial.[7]

---

5. "7. One speciment of each and every catalogue or other piece of advertising or sales promotional material published or distributed by the defendant illustrating or describing folding chairs made and sold by defendant and embodying the construction of the folding chair disclosed and claimed in patent No. 2,699,816, in suit;

    *     *     *     *     *

"11. One specimen of each and every catalogue or other piece of advertising or sales promotional material published by the defendant in the years 1950, 1951, 1952 and 1953, illustrating or describing folding chairs manufactured and sold by the defendant embodying an arm rest having a spindle at the front and portions thereof and connected to the front and portion of the arm rest below the latter;" A. 726, 727.

6. For example, interrogatories 14 and 27 (a), and the answers thereto, were as follows:
Interrogatory No. 14: "State the earliest date when the defendant sold a folding chair embodying the construction disclosed and claimed in patent No. 2,699,816, in suit.
Defendant's Answer: "Sometime shortly after January 15, 1953.

Interrogatory No. 27(a): "State the date when the defendant first began producing folding chairs embodying the construction disclosed and claimed in United States Letters Patent No. 2,699,816, in suit, which are referred to in the following testimony of John B. Gittings, given by him in his deposiiion taken by the plaintiff, in Kenosha, Wisconsin on July 16, 1964, said testimony being as follows (Tr.P. 70):
    " 'Gosh, I don't know. I imagine we started shipping them in January, 1953. We started producing them that previous fall to get them into stock.' "
Defendant's Answer: "Defendant at this time, does not know the date requested and it has been unable to find any records which would indicate this date." A. 407.

7. For example, John B. Gittings testified:
    "Q. Mr. Gittings, in your deposition —would you tell the Court, first of all, when you first advertised, Gold Medal advertised that is, the subject matter of the '816 non-sag back patent in suit?
    "A. In January, 1953.
    "Q. And I hand you—that was the first advertisement of any kind; is that right?
    "A. Yes, sir.

With some reluctance, the district court accepted the defendant's explanation for the failure to disclose the critical, damaging documents.[8] Again, however, we are persuaded that defendant's lack of diligence, even though not constituting deliberate fraud, is of sufficient importance to require consideration in determining the appropriate remedy.

At the time of the entry of the "Final Judgment on Mandate" on October 31, 1968, plaintiff had lost a lawsuit which it was plainly entitled to win. It had incurred expenses for legal fees and other costs of litigation that would not have been necessary if defendant, or its counsel, had made a conscientious investigation of the timeliness of the application for the '816 patent. Plaintiff entered into a voluntary settlement which gave defendant benefits it should never have received. Those benefits not only included the payment of $15,000, but also the protection against competition from chairs embodying the '816 non-sag back feature and also a waiver of an appeal from the finding of validity of the design patent. We cannot retrospectively determine whether or not the 1968 appeal would have been successful, but it certainly was not frivolous. Thus, since 1968 defendant has had the benefit of an injunction against infringement of the '816 patent—a benefit that we do not know how to evaluate but which was plainly unwarranted—and also the benefit of an injunction against infringement of the design patent—a benefit which arguably it should never have received.

■ These considerations would support a reinstatement of the appeal from the portion of the original judgment of validity of the design patent and the postponement of the ultimate determination of the pecuniary rights of the parties until that issue is resolved. However, defendant's lack of diligence has already caused this litigation to be much more protracted than it ever should have been. We therefore decide that relief should be entered which will (1) promptly and completely terminate this litigation, and (2) insofar as practicable, impose upon defendant, and absolve plaintiff from, the costs consequent upon its exceptional lack of diligence.

"Q. First offer for sale of any kind?
"A. Right.
* * * * *
"Q. And you have searched your advertising material and you can find no advertising in 1952 of the non-sag back [446] feature?
"A. I find no advertising matter at all that we advertised it in 1952.
"Q. And you kept that in a scrapbook, did you?
"A. Yes, sir, we have a scrapbook."
A. 411, 419.

And William D. Gittings testified:

"Therefore, on the particular non-sag back feature, which we are talking about, I am sure that we began producing those back posts probably in late December, 1952. We were aware of the fact that we were going to introduce them in '53 at the Chicago Furniture Show in January, and also by reason of our '53 Catalog, which was mailed shortly after January 15th. It would do us no good to ship these chairs ahead of the resultant good that we could get from introducing it to the trade at the Shows and through the use of our catalogs. Therefore, I am sure that we did not produce these back posts prior to late December of '52, and we started shipping the chairs—we have a normal ten-day cycle in our Assembly Department—after January 15th of '53 when the catalog came out." A. 430.

8. "Strassheim's counsel had every right to rely on Gold Medal's representations that it had produced all of the pertinent material in their files requested by Strassheim during the discovery period.
* * * * *
"It is understandable that they might not remember events occurring more than fifteen years ago. More perplexing is the failure to disclose the damaging items contained in their own scrapbooks when requested so to do during the pendency of the trial. But a finding that this was deliberate concealment rather than a simple failure to examine their files and the scrapbooks carefully cannot be made. A finding of deliberate misrepresentation and fraud requires stronger and more convincing evidence than that which has been adduced." A. 280, 283.

■ Even though plaintiff failed to sustain its heavy burden of proving actual fraud, defendant's lack of diligence, both in 1953 and in 1964, was sufficiently serious to make this an "exceptional case" within the meaning of 35 U.S.C. § 285.[9] Plaintiff, as the prevailing party, is therefore entitled to an award of reasonable attorneys' fees. That right did not mature until the 1964 depositions in Kenosha had been concluded without the critical documents being produced; we therefore conclude that the award should only cover services subsequent to August 4, 1964.[10]

■ The impossibility of accurately measuring the offsetting value of defendant's damage claim for pre-1968 infringement of the design patent, on the one hand, and its unwarranted protection from post-1968 infringement of the '816 patent, on the other, makes it dubious as to which party should recover from the other even if the design patent is assumed to be valid. We need not face that issue because plaintiff has persuaded us that the design patent is completely lacking in invention and should be held invalid.[11]

9. Fee awards pursuant to § 285 are most frequently predicated on a claim of fraud. In such cases we have required clear and definite proof of fraud. Armour & Co. v. Wilson & Co., 274 F.2d 143, 148 (7th Cir. 1960); Sarkes Tarzian, Inc. v. Philco Corp., 351 F.2d 557, 560 (7th Cir. 1965). The "exceptional case" justification for the allowance of fees is not, however, limited to the fraud category. See, e. g., Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 597 (7th Cir. 1972); General Instrument Corp. v. Hughes Aircraft Co., 399 F.2d 373, 380–381 (1st Cir. 1968). The award in this case is supported not only by the patentee's failure to verify or disclose critical facts at the time of application,

but also by the same considerations that underlie the authorization of sanctions for failure to make discovery. See Rule 37, Fed.R.Civ.P. This case is truly exceptional because the record unambiguously demonstrates that the defendant's "exceptional oversight" with respect to "critically important information" (cf. 399 F. 2d at 381) resulted in an erroneous judgment and put plaintiff to legal expenses that would otherwise have been unnecessary.

10. Although Gittings was deposed on July 16, he signed the deposition on August 4. We think this is the appropriate date from which to measure fees.

11. The claim in the patent is on the "ornamental" design for a collapsible chair, the dominant features of the design being shown in the heavy lines in these two figures:

The order terminating this litigation should provide for:

1. Return to plaintiff of the entire settlement payment of $15,000 plus interest;

2. An award of attorneys' fees covering the services of plaintiff's counsel in this litigation subsequent to August 4, 1964;

3. A finding that the design patent is invalid for lack of invention;

4. Vacation of the injunction against infringement of the design patent; and

5. Except for such costs as the district court may tax against defendant, no other monetary award shall be made in favor of either party. The costs of this appeal shall be taxed against defendant.

Plaintiff's other requests for relief were properly denied in view of the district court's finding on the issue of fraud.

The judgment entered on November 1, 1971, is vacated and the case is remanded for the entry of a new judgment consistent with the foregoing.

Vacated and remanded.