**LOCTITE CORPORATION, Plaintiff,**

v.

**FEL–PRO INCORPORATED and Felt Products Mfg. Co., Defendants.**

Civ. A. No. 77 C 2278.

United States District Court,
N. D. Illinois, E. D.

Aug. 15, 1980.

Theodore R. Scott, Chicago, Ill., Walter D. Ames, Watson, Cole, Grindle & Watson, Washington, D. C., J. Rodney Beck, Newington, Conn., for plaintiff.

Marshall W. Sutker, R. Howard Goldsmith, Dressler, Goldsmith, Clement, Gordon & Shore, Ltd., George B. Newitt, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGARR, District Judge.

*Findings of Fact*

1. The complaint was filed by Loctite Corporation ("Loctite"), a Connecticut corporation having offices in Newington, Connecticut, on June 24, 1977. It charged Fel-Pro Incorporated ("Fel-Pro") with infringement of three patents, U. S. Patents 3,041,-322, 3,046,262, and 3,218,305. It was amended on September 30, 1977 to name Felt Products Mfg. Co. ("Felt Products") as an additional defendant. Fel-Pro and Felt Products are corporations of Illinois and Delaware, respectively, and have offices in Skokie, Illinois, in this district and division.

2. Defendants' answers to the amended complaint and counter-claims were filed on October 17, 1977. A fourth patent, U. S. Patent 3,043,820, was added by defendants' amended counterclaim on February 28, 1979. Plaintiff claimed infringement of that patent by its reply dated April 16, 1979.

3. Jurisdiction and venue are conferred upon this court under 28 U.S.C. §§ 1338(a) and 1400(b).

4. The subject matter of the four patents in suit is anaerobic sealants and adhesives. Anaerobic products set up, solidify, and therefore cause sealing or adherence, in the absence of air (U.S.Pat. 3,041,322, Col. 1, lines 35, et seq.). The patents involved in this case are asserted to be improvements in the field of anaerobic sealants and adhesives.

5. Each of the four patents in suit concludes with patent claims, each specifying ingredients and quantities and plaintiff has acknowledged its burden to prove infringement.

6. It is with efforts to secure a specification of the factual basis for plaintiff's charges of infringement through discovery, that this court and defendants have been largely involved since the case was filed.

7. Prior to the filing of this action, defendants determined to get into the business of selling anaerobic compositions, and contacted Loctite regarding the possible purchase of products from Loctite for resale (Lehman Dep., p. 15). On March 25, 1976, defendants advised Loctite's president that defendants had developed their own anaerobic products, stating that "Our laboratory people were cautioned that their own efforts had to take into consideration the Fel-Pro policy of not infringing on any existing patents, be they Loctite or any others" (Westervelt Dep. Exh. W–57). On April 23, 1976, samples of, and literature describing, defendants' anaerobic products were sent to Loctite's president (Elliott Dep. Exh. E–45).

8. In 1976, plaintiff ran two sets of tests on defendants' products. Mr. Kubik found cumene hydroperoxide or some peroxide to be present (Kubik Dep. Exh. K–27; pp. 84–7). Plaintiff's laboratory supervisor, Dr. Leonard, found tertiary butyl hydroperoxide ("TBHP") was present (Leonard Dep. Exh. L–3). Plaintiff states that when it filed this action, it relied on Leonard's tests (Leonard Dep. Exh. L–3; Trans. 9/20/79, p. 18). Leonard admitted he did not quantify the test results (Leonard 88–90) and no quantitative test data supporting infringement have been produced.

9. Plaintiff filed this patent infringement action on June 24, 1977.

10. On August 18, 1977, defendants served a deposition notice for plaintiff's officer having the greatest knowledge of the infringement facts (Dep. Not. 8/18/77). Plaintiff stated its "intention to produce the officer of Loctite who has the best knowledge of the decision to bring the above-entitled action, together with documents relating to Loctite's knowledge of defendant's infringing acts" (Exh. AFM–1). Counsel for defendant asked for a copy of the analytical report supporting the charges to review before the deposition (Exh. AFM–2).

11. Jean Mauro, Loctite's Assistant Secretary, its in-house patent attorney (Mauro 3–5), and listed as being of counsel on many of the documents filed in this case, was deposed on September 16, 1977. At his deposition, plaintiff repeatedly refused to disclose the test results upon which it based its complaint (Mauro 94–5), asserting they were irrelevant (Mauro 19, 46–47, 57–58). During a recess, plaintiff's counsel asserted that it had found the chemical tertiary butyl hydroperoxide, TBHP, to be present (Sutker 10/21/77 Aff.).

12. On October 6, 1977, Mr. Ames, counsel for plaintiff, stated that further tests had been run and that the Loctite test procedures "tended to overlap with respect to tertiary-butyl hydroperoxide and persulfates," a non-infringing catalyst (Sutker 10/21/77 Aff.; Leonard 504). On October 6, 1977, plaintiff was uncertain whether the required TBHP catalyst upon which it based this case was present in defendants' products, and Leonard later admitted that he was dubious about his TBHP tests as of September/October, 1977 (Leonard 500–504), feeling that perhaps a persulfate was what was present, not TBHP. On July 18, 1978, counsel again stated that Leonard felt that a persulfate rather than TBHP was present (McDowell Dep., p. 271–2).

13. On October 25, 1977, defendants filed a motion to compel discovery and an affidavit of defendants' chief chemist testifying that defendants put in none of the claimed catalysts (McDowell 10/21/77 Aff.).

14. Early in the case defendants had also filed Interrogatories 5–7, seeking a specification of the charges of infringement by product ingredient and quantity. Plaintiff did not identify each ingredient by name or quantify the ingredients in the responses filed on December 29, 1977.

15. On March 20, 1978, this court held that plaintiff's argument that the test results were "not relevant is without merit," and that

Defendants have the right to refute plaintiff's evidence of infringement, and information on these tests [the presuit tests] is clearly relevant for that purpose. Order, p. 2. This court also held that defendants had "a right to be apprised of the specific allegations against" them, that the pre-suit tests were not privileged, and that claims of work product did not justify withholding of the evidence upon which plaintiff based its charges of infringement. Plaintiff to this day has failed to specify its charges by identifying by accused product, the infringing ingredients it contains, and the quantities of those ingredients present.

16. On May 24, 1978, defendants took the deposition of Dr. Leonard and asked such questions as whether he believed the 1976 test results which this court ordered produced on March 20, 1978 were correct and why he had slashed out TBHP on one exhibit (Leonard Exh. L–5). Plaintiff's counsel directed Leonard not to answer those and like questions (Leonard 69, 94–97, 200).

17. Those questions were presented on a Rule 37 motion to this court on July 18, 1978. On October 31, 1978, the magistrate ordered Leonard to be presented to answer them. Plaintiff appealed, and on January 2, 1979, this court affirmed the order.

18. On July 18, 1978, after Leonard refused to answer whether his TBHP tests were correct, defendants filed a motion for partial summary judgment of non-infringement as to U.S. Patent 3,041,322 (the TBHP patent). The TBHP patent required the presence of the specific catalyst TBHP. Defendants showed that they never put TBHP into their products (McDowell Affs. dated 10/21/77 & 7/19/78). Plaintiff opposed, stated that plaintiff was convinced that TBHP was present based on Leonard's testimony:

Loctite believes Dr. Leonard's tests showing the presence of TBHP are correct.

\* \* \* \* \* \*

In view of the fact that the sole sworn evidence [Leonard's deposition testimony] as to the presence of TBHP *in the accused sealants* is in this opposition to the motion [for summary judgment] that motion is clearly insufficient.

Opposition filed 8/9/78, pp. 9, 12. On the day the opposition was filed, Leonard no longer believed his 1976 TBHP tests were correct. Instead he believed it was almost certain that TBHP was not present (Finding 20). In that same opposition of August 9, 1978, plaintiff urged that defendants' motion was "spurious" (p. 2), and in plaintiff's rebuttal filed on October 5, 1978, plaintiff insisted that the motion was "brought in bad faith" (Rebuttal memo filed 10/5/78, p. 3).

19. On January 2, 1979, this court denied the motion for partial summary judgment on the TBHP patent "[a]s the result of the factual issue thus created by this contention [that Leonard was convinced TBHP was present based on his tests]" (Order of 7/18/79). This court was not then aware that Leonard believed "it was highly probable that TBHP was not present in defendants' products." Order of 7/18/79.

20. On January 2, 1979, this court also affirmed the magistrate's order requiring plaintiff to present Leonard to answer the questions referred to in Finding 16. On February 7–8, 1979, Leonard testified that he had become convinced, 85 to 90 percent certain, that TBHP was not present by April 13, 1978 (Leonard 467–469), that he had become doubtful of the tests by October, 1977 (Leonard 501–501), and that he had, as a result, slashed out a TBHP entry in his notebook records in September or October, 1977 (Leonard 499–501). This was before defendants filed their motion for summary judgment.

21. On July 27, 1979, plaintiff's counsel stated that Leonard concluded that the TBHP tests were erroneous because of "an impurity" in the testing apparatus (Ames Aff. filed 7/27/79).

22. Leonard testified on February 8, 1979 that he had not run further tests after December, 1976 to confirm or corroborate his December, 1976 pre-suit TBHP tests (Leonard 609–610) and Leonard testified he had never isolated TBHP from defendants' products (Leonard 177).

23. During the pendency of defendants' motion for summary judgment on the TBHP patent, plaintiff knew or clearly should have known, but did not advise either this court or defendants, that Leonard no longer believed the original test results upon which plaintiff relied to oppose that motion, and indeed that the test results relied on were 100 percent wrong.

24. On March 27, 1979, defendants filed their renewed motion for summary judgment. On May 24, 1979, this court granted the motion. On July 18, 1979, this court imposed the sanction of dismissal, holding:

The delay of plaintiff in pursuing the [TBHP] matter after the doubts of Dr. Leonard as to the accuracy of his tests first arose constitutes a clear breach of the duties plaintiff and plaintiff's counsel owe the court and opposing counsel to investigate and abandon an erroneous factual position asserted by the plaintiff much more diligently and quickly than was done here.

Order, p. 3. Plaintiff sought reconsideration of the award of sanctions. The motion for reconsideration of the award of sanctions was denied.

25. Inasmuch as plaintiff had relied upon TBHP as the catalyst ingredient to support its claim of infringement as to all of the patents in suit (Response to Def. Int. 5 filed 12/29/77), the absence of TBHP in the accused products also suggests the absence of a factual basis for maintaining the suit as to any of the patents in suit. This suspicion was raised by the court with plaintiff on October 2, 1979 (see Finding 39). Plaintiff did not move to dismiss the case, arguing instead that it had new unrevealed facts which Ames had ordered Leonard not to write, deliberately to prevent access by defendants (Trans. 9/20/79, p. 28).

26. By July 18, 1979, defendants had repeatedly asked plaintiff to specify its charges and to produce related documents. In July, 1978, Fel-Pro again inquired as to which specific products were charged to infringe the patents (and which claims), and asked for supporting data, for ingredient identification and for quantities (Fel-Pro Ints. 18–20). Plaintiff gave no new ingredient or quantitative data and instead objected, stating that defendants were seeking "to extort information and admissions from plaintiff" and re-raised the work-product objection (Responses to Ints. 18 & 19, filed 8/30/78). In response to Fel-Pro Interrogatory 21, on 8/30/78, plaintiff again failed to provide a specific answer, and reiterated the presence of TBHP in each of the accused products, stating they contained "less than 15% of tertiary butyl hydroperoxide," the upper limit in the TBHP patent. On August 30, 1978, when that answer was sworn to, Leonard no longer believed TBHP to be present (See also the further responses to Fel-Pro Ints. 18 to 20 filed 3/23/79 and the responses to Felt Products Ints. 28 to 30 filed 7/26/79, which also failed to identify specific ingredients and quantities though such was asked for).

27. To July 26, 1979, plaintiff avoided producing specific quantity data, and avoided giving specific catalyst information, in answers to interrogatories, except for the disclaimed TBHP. None of the interrogatory responses claiming the presence of TBHP as an ingredient satisfying the remaining three patents in suit have been amended, as required by Rule 26(e)(2).

28. Plaintiff's July 26, 1979 responses to Felt Products' Interrogatories 26 to 30 introduced a new catalyst theory into the case, i.e., that a "hydroperoxide moiety" was present in the accused products. That expression was neither identified by specific chemical name, nor has plaintiff stated how much was present.

29. In July, 1979, defendants filed Rule 34 document demands asking plaintiff to produce all documents relating to tests and "hydroperoxide moieties," including:

> All documents referring or relating to any tests made at any time by or on behalf of plaintiff or by or for counsel for plaintiff which tend to support or refute the charge of infringement
> a) as to U.S.Patent 3,043,820
> b) as to U.S.Patent 3,218,305.

(July 16, 1979 Document Demand No. 11).

> All documents referring or relating to the presence or possible presence in any of the accused products of "a hydroperoxide moiety on the monomer."

(July 26, 1979 Document Demand No. 1). Plaintiff did not file timely responses or objections. On September 4, 1979, defendants moved to require plaintiff to produce those documents.

30. On September 4, 1979, Magistrate Sussman ordered those documents produced. On September 5, the order was affirmed and on October 18, this court ordered plaintiff to comply fully with the document demands by November 2, 1979.

31. During a hearing involving the September 4 order and discovery, on September 20, 1979, nineteen months after this court's March 20, 1978 order, Mr. Ames stated in open court:

> I have written to my client [Loctite] saying do not make documentary records of whatever tests you run until I tell you to do so. * * * I have asked my client not to make a record [of its tests].

(Trans. pp. 15–16). His stated purpose was to foreclose the possibility that the tests might become known to defendants because of earlier orders requiring production of test results (Trans. 9/20/79, p. 28).

32. This court then and there ordered plaintiff to produce all test results, pro or con, to reduce the withheld information to writing, and to turn that over to defendant:

> The Court: Mr. Ames, if you have had tests which disclose any information to you about the presence or absence of a hydroperoxide moiety in the monomer, the question is, if you have those you can't keep them out of this litigation by keeping them in the mind of Dr. Leonard and not putting them in writing. If you have such tests or have such information which bears on that subject pro or con I am going to order you to disclose it before you take the deposition of Sartomer.... The Court's order simply is, if a test has been made concerning the presence or absence of a product which you claim is relevant to the issues in the case, it is part of the discovery and the defendants are entitled to access to the reports of that test. You can't avoid that by having no report.

(Trans. 9/20/79, pp. 24–6).

> The Court: What I am saying is, if you have tests which constitute reliable information, and in the instance of Dr. Leonard that becomes questionable based on his past performance—of the presence of a hydroperoxide moiety or any other issue which you are going to raise in the intended deposition ... those tests should be reduced to some sort of a written report by Dr. Leonard which the defendants have access to before they have to go to the deposition... That means, call your doctor in Ireland and tell him to give you a report on these tests and turn it over.

(Trans. 9/20/79, pp. 27, 31).

33. This court also warned plaintiff it was "not happy with the way this discovery is going" (page 26) and that

> ... if you told him [Leonard] that in his tests he should not make reports, that is

an avoidance of discovery which sets you up, as far as I am concerned, for sanctions at the end of the trial because of the difficulties you have created by way of blocking opportunities for discovery. You are fighting a last ditch retreating battle here and throwing grenades at every turn and you're putting the defendants through an extraordinary amount of trouble and expense... But my only assurance to the obviously frustrated defendants who have a genuine reason for being frustrated is that once again your only remedy is in sanctions depending on how this all turns out.

(Trans. 9/20/79, pp. 19, 22). Plaintiff has not yet reduced Leonard's test results to writing and has failed to produce many other documents called for by the September 4 order.

34. By September 20, 1979, plaintiff had had full discovery from defendants, securing their formulation sheets, test data, research records, depositions of defendants' Chief Chemist and his assistant (see McDowell and Patel Deps.) making a plant inspection, securing samples of the products during plant production, including raw materials and the like (see McDowell Dep. of 10/4/78) and had that material available for its use in connection with the required compliance. The only discovery plaintiff had asked for which it did not take was a deposition it had the right to take in September, 1979, as soon as it turned over Leonard's tests and the documents ordered produced (Trans. 9/20/79, p. 31). Plaintiff did not reduce Leonard's tests to writing, and failed by its own choice to take the deposition.

35. Plaintiff's compliance with the September 4 and October 18, 1979 orders (see Finding 29) was incomplete, untrue and evasive. Plaintiff's complete "declaration" of compliance with Document Demand 11 of July 16, 1979, filed November 5, 1979, was (page 5):

> There is no way that this request can be answered honestly. It calls for the objective view of the undersigned, who would be committing malpractice if he answered

it in an objective manner and, as an advocate, is utterly incapable of doing so anyway.

Plaintiff produced no Leonard "hydroperoxide moiety" data, and trial counsel stated they had made "no personal searches" for records in their files respecting test data and the like (Declaration 11/5/79, p. 1) despite the assertion in August, 1979 by counsel for plaintiff that there had been recent "extensive experimentation" relating to the hydroperoxide catalysts (Centola Aff. filed 8/28/79). The materials showing "extensive experimentation" have not been produced. Several additional documents first produced with a Further Declaration of Compliance filed on November 26, 1979 also show the November 5 Compliance was incomplete.

36. On January 21, 1980, defendants filed a motion to require plaintiff to comply with the Orders of September 4 and October 18, 1979, or to suffer dismissal. Asserting they were in compliance, in their February 7, 1980 Opposition, Exh. I, plaintiff for the first time identified a long list of Broadview case documents which defendants had long ago sought to have identified (Exh. CG to Motion filed 1/21/80). Plaintiff offered no valid explanation for not identifying those documents previously, instead referring to a fire "several years ago" as an excuse. The fire was at least 18 years ago (Exh. CU to Reply Brief filed 2/12/80) and could have had nothing to do with either tests run during the past several years or the earlier lawsuit documents belatedly and incompletely identified on February 7.

37. On February 22, 1980, Loctite forwarded still further documents which were covered by the orders of September 4 and October 18, 1979, which documents themselves revealed the existence of still others not yet produced (Exh. AFM–3).

38. Plaintiff has failed repeatedly to comply with the orders of September 4 and October 18, 1979, has opposed defendants' motion requiring complete compliance by asserting that it has fully complied when that was not so, and has ignored the directions and orders of this court on March 20, 1978 and September 20, 1979.

39. On October 2, 1979, respecting production of test results, in response to the repeated claim of work product as to tests and the like, this court stated (Trans. pp. 11–12):

There is an issue in this case that wasn't part of the case originally but has become a part of the case in the course of the protracted discovery that we have had and the many controversies over the discovery. That is whether Loctite has had or now has any information which contradicts any of the allegations in the complaint. . . . I think that this motion to dismiss [Motion to Show Cause], and these charges which raise the suspicion that Loctite may be proceeding with litigation without an adequate basis in fact to maintain it are the exceptional circumstances of the type of rule they had in mind when they used that phrase. These are exceptional circumstances and consistent with the rule there is no other way in the world in which the defendants are ever going to find out what the tests of their products in the Loctite lab was unless they see the report which the doctor maintained.

40. By September 20, 1979, plaintiff had admitted that Leonard changed his opinion by a factor of one hundred percent (Trans. 9/4/79, p. 12), that he was "tarnished" (Trans. 9/20/79, p. 33), and that he "vacillates" (Trans. 9/4/79, p. 12). Mr. Ames stated that he was "horrified" when he learned that the TBHP analysis "was based on an impurity that got in" (Trans. 9/4/79, p. 22).

41. It was not fair or proper for plaintiff to have waited until mid-1979 to disclaim its test results when it was told in September, 1977, and by sworn affidavits in October, 1977, that defendants did not use TBHP and Leonard admittedly became doubtful in September/October, 1977.

42. Where, as here, plaintiff insisted that infringing ingredients which defendants do not put in are somehow generated *in situ* by an undefined chemical reaction, it

was essential and remained plaintiff's obligation to tell defendants and this court what it found to be present and how much it found.

43. As on March 6, 1980, the date on which this action was dismissed, a number of motions filed by defendants were pending, including:

1) a motion filed July 16, 1979, for summary judgment of non-infringement of U.S. Patent 3,046,262, asserting there was no evidence to support the catalyst quantity requirement;

2) a motion filed September 20, 1979, seeking an order requiring plaintiff to show cause why the complaint should not be dismissed for failure to specify by claim, ingredient and quantity its charges of infringement;

3) a motion filed January 21, 1980 to require plaintiff finally to comply with this court's prior discovery orders; and

4) a motion filed September 17, 1979 to compel discovery under Rule 37 to require plaintiff to respond to unanswered and unobjected to interrogatories, and to other interrogatories which plaintiff had previously agreed to answer (see Sutker Aff. dated 9/14/79 and attachments filed with the motion to show cause filed 9/20/79).

44. These motions focused on the same basic issues: a) that defendants were not receiving the discovery they were entitled to, especially by way of a specification of the infringement facts, and b) that there was an absence of facts to support the ingredient and quantity requirements of the claims. Plaintiff's repeated reliance on overruled objections, plaintiff's tenuous and misleading and irrelevant arguments, plaintiff's reliance on discarded facts, plaintiff's arguments and affidavits which were inconsistent with prior assertions of fact and belief, plaintiff's failure to comply with prior orders of this court, plaintiff's failure to correct misleading discovery responses, plaintiff's suppression and concealment of evidence, and plaintiff's assertions of compliance which were not true and correct, all lead this court to the conclusion that dismissal was the only fair and proper manner of dealing with this exceptional situation. Repeated admonishment by the court has failed to alter the behavior of plaintiff and its counsel in this case.

45. On March 6, 1980, this court dismissed the complaint, by way of sanction for the conduct heretofore described.

46. From the beginning of this litigation, this court "consistently emphasized the importance of discovery and of defendants' right to it" (order 3/6/80). Plaintiff has flouted this court's authority and orders in that regard.

47. Plaintiff and its counsel have not properly complied with the letter and spirit of the discovery rules and with prior orders of this court.

48. The behavior and conduct of plaintiff and its counsel constitutes a clear breach of the duties plaintiff and plaintiff's counsel owe the court and opposing counsel.

49. Plaintiff and its counsel have willfully withheld, concealed and suppressed evidence which was relevant to defendants' non-infringement and misuse defenses.

50. Plaintiff and its counsel have made material misrepresentations in briefs and affidavits filed in this case.

51. Plaintiff and its counsel have reasserted overruled objections making discovery in this case unduly difficult for defendants, and have obstructed discovery.

52. Plaintiff has placed an undue and improper burden on defendants and this court, has seriously impaired and delayed defendants' discovery and preparation for trial and has put defendants through a significant amount of trouble and expense.

53. Plaintiff, through its officers and agents as well as through its counsel, was aware of the orders of this court and the requirements imposed upon it. From the beginning, plaintiff's Assistant Secretary, Mr. Mauro, was advised that defendant did not introduce the accused catalysts. House counsel, also officers of plaintiff, were listed as of counsel on most of the papers filed by plaintiff in this case, including Mr. Mau-

ro, Assistant Secretary of the plaintiff, who plaintiff insisted should have access to all of defendants' confidential information to enable him to participate effectively in the case (Motion for Modification of Protective Order filed 3/21/79), and Mr. Reck, Vice President and general counsel of plaintiff. From time to time, defendants' counsel sent copies of motions and briefs directly to house counsel and plaintiff's corporate officers, Messrs. Mauro and Reck, on the matter of discovery problems (Dft. Motion to Show Cause, Exh. MDS–2 filed 9/20/79). Both plaintiff and its counsel have been responsible for the manner in which this case has been conducted.

54. Having failed to specify its charges of infringement and, therefore, having failed to demonstrate that it has a prima facie case of infringement, the court finds that this patent infringement case is exceptional and that defendants are entitled to reasonable attorneys fees under 35 U.S.C. § 285 from plaintiff.

55. Considering the actions of plaintiff and counsel in this case on discovery, the court finds that defendants are entitled to monetary sanctions from plaintiff and its counsel for the repeated failure to comply with orders of this court and the discovery rules.

56. On the facts of the case, this court finds that in the imposition of sanctions against plaintiff and its trial counsel, under Rule 37 and pursuant to the inherent power of this court, the court may consider reasonable expenses, including attorneys fees, but is not limited in the determination of appropriate sanctions to a determination of the amount of such fees and the award of that precise amount as a sanction. Monetary sanctions are quasi-punitive and the appropriate amount is the product of the equitable judgment of the court, after consideration of the spectrum of aggravating and mitigating factors.

57. On the facts of this case, plaintiff having admitted it had no quantity data when it filed this case and having had good reason to believe that the original 1976 tests were wrong, this court finds this case is exceptional and that, under 35 U.S.C. § 285, defendants are entitled to receive from plaintiff a sum in compensation for reasonable attorneys fees expended during the period October 1, 1977 to March 6, 1980, when this case was dismissed. The attorneys fees claimed by defendants are reasonable and are commensurate with those in this community, and the amounts of time expended are reasonable under the circumstances of this case. It is the judgment of the court, however, that a sum less than the full amount of the fee claimed is appropriate in this case. (The amount sought by the Dressler firm for the period October 1, 1977 to January 31, 1980 is $178,931.32; the amount sought by the Allegretti firm for the period October 1, 1977 to March 31, 1980 is $54,826.46; and the total amount sought is $233,757.78.)

The court concludes that the defendants are entitled to attorneys fees in the sum of $150,000.00, in addition to $1,500.00 previously awarded as sanctions (order of 7/18/79). The court finds also that defendants are entitled to an award of costs in the amount of $6,250.30, as indicated by the Bill of Costs heretofore filed. It is ordered that these sums shall be paid to defendants by plaintiff within sixty days.

*Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. Any Finding of Fact which is determined to be a Conclusion of Law shall be deemed to be such and any Conclusion of Law which is determined to be a Finding of Fact shall be deemed to be such.

3. The burden of proving infringement is on patentee. Defendants have the right to know and discover before trial the facts on which plaintiff bases its charges of infringement, and defendants are entitled to know the specific factual basis for infringement charges, *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947); Rule 26(b)(1), Fed.R. Civ.P.

■ 4. Where a charge of patent infringement is based upon tests conducted by a party, as a standard business practice, they are producible, Cf. *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367 (D.C.N.D.Ill.1972).

■ 5. An alleged infringer must have access to tests conducted by a patentee where those are the only facts which plaintiff has to support its charges of infringement, *E. I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 24 F.R.D. 416, 421–423 (D.C.Del.1959).

6. The court has discretionary authority over the progress of discovery.

■ 7. Where sanctions have been awarded once against plaintiff for a clear breach of the duties plaintiff and plaintiff's counsel owe the court and opposing counsel to investigate and abandon an erroneous factual position much more quickly than was done here and for plaintiff's failure to act with reasonable diligence in connection with this, and plaintiff disobeys a court order and continues to obstruct and impede discovery, dismissal of a complaint is proper.

8. Parties unjustifiably resisting discovery are subject to sanctions. The imposition of sanctions is in the discretion of the trial court, Rule 37, Fed.R.Civ.P. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Margoles v. Johns*, 587 F.2d 885 (7th Cir. 1978).

■ 9. Dismissal of a complaint is warranted for flagrant bad faith of plaintiff and its counsel, and for the callous disregard of their responsibilities to obey repeated directions and specific discovery orders of the court and for withholding and suppressing evidence. *National Hockey League v. Metropolitan Hockey Club, supra; Margoles v. Johns, supra; G–K Properties v. Redevelopment Agency of San Jose*, 577 F.2d 645 (9th Cir. 1978); *Independent Investor Protective League v. Touche Ross & Co.*, 607 F.2d 530, 25 F.R.Serv.2d 222 (2nd Cir. 1978).

10. Counsel's instructions to plaintiff's personnel not to make written reports of laboratory tests conducted to ascertain whether plaintiff has facts to support its charges of infringement so that they will not become available to the court or to defendants is an avoidance of discovery.

11. A party has a duty to supplement discovery responses when it or its counsel obtains knowledge that a response previously made is, or may well be, incorrect. Rule 26(e)(2), Fed.R.Civ.P., *Holiday Inns, Inc. v. Robertshaw Controls Co.*, 560 F.2d 856, 858 (7th Cir. 1977). This applies to changes in opinions of those held out to be experts as well, *Voegeli v. Lewis*, 568 F.2d 89, 96–97 (8th Cir. 1977).

12. It is within the court's discretion to require a party failing to make discovery, or the attorney advising or participating in it, or both, to pay the reasonable expenses, including attorneys fees, caused by the failure; the court may do so in lieu of or in addition to other orders. Rule 37, Fed.R. Civ.P. *Independent Inventor Protective League v. Touche Ross & Co., supra; Szilvassy v. United States*, 82 F.R.D. 752 (D.C. S.D.N.Y.1979); *Costal Plastics v. Morgan, Olmstead, Kennedy & Gardner*, 72 F.R.D. 601 (D.C.W.D.Pa.1976).

■ 13. Where a party, through its counsel, reasserts overruled objections on the same issues, makes misrepresentations to the court, and shows a disregard of his obligation to the court, it may be required to pay the reasonable expenses, including attorneys fees, under Rule 37, Fed.R.Civ.P., *Costal Plastics v. Morgan, Olmstead, Kennedy & Gardner, supra; Independent Investors Protective League v. Touche Ross & Co., supra; Szilvassy v. United States, supra.*

14. Facts which raise the suspicion that plaintiff may be proceeding with litigation without an adequate basis in fact to maintain it are exceptional circumstances within the meaning of Rule 26(b)(4)(B), Fed.R. Civ.P., which permits the discovery of facts or opinions, even of an expert who has been retained or specially employed by another party and who is not expected to be called

as a witness at trial. Plaintiff's regularly employed analytical chemists who possess the only facts upon which plaintiff filed and maintained this case were not and cannot be considered experts under Rule 26(b)(4)(B) such that defendants cannot learn of the factual basis for plaintiff's complaint.

15. A court in exceptional cases may award reasonable attorneys fees to the prevailing party, 35 U.S.C. § 285. An award of attorneys fees to the prevailing party is discretionary. An award is proper when a patentee brings or maintains a lawsuit knowing, or having good reason to know, a patent is either invalid or not infringed or where a patentee files or maintains a case in bad faith, *Shelco v. Dow Chemical Co.*, 466 F.2d 613, 618 (7th Cir. 1972); *Kaehni v. Diffraction Co.*, 342 F.Supp. 523, 533–537 (D.Md.1972), *aff. mem.*, 473 F.2d 908 (4th Cir. 1973), *cert. den.*, 414 U.S. 854, 94 S.Ct. 151, 38 L.Ed.2d 103 (1973), *reh. den.*, 414 U.S. 1033, 94 S.Ct. 465, 38 L.Ed.2d 325 (1973), and where it causes gross injustices to the prevailing party, *Skil Corp. v. Lucerne Products*, 503 F.2d 745, 750 (7th Cir. 1974), *cert. den.* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975).

16. A finding of fraud is not necessary to support an award of attorneys fees under 35 U.S.C. § 285, *L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818, 824 (7th Cir. 1973); *Skil Corp. v. Lucerne Products, supra.*

17. A patent case may be held to be "exceptional" under 35 U.S.C. § 285, where a plaintiff asserting a patent insufficiently investigates the facts, files and pursues a case without reasonable care and without sufficient justification, thereby placing an unnecessary and unwarranted burden on defendants, *Talon v. Union Slide Fastener*, 266 F.2d 731, 739 (9th Cir. 1959), *Kaehni v. Diffraction Co., supra; see also Wood Products Development Co. v. Cloud Oak Flooring Co.*, 267 F.Supp. 193, 248 (W.D.Mo.1967).

18. The failure to disclose critical facts and documents at the times they are required to be produced, resulting in an erroneous order, such as the TBHP summary judgment denial, resulting in substantial legal expense which would have been unnecessary otherwise, makes this case exceptional and justifies an award of attorneys fees under 35 U.S.C. § 285, *L. F. Strassheim Co. v. Gold Medal Folding Furniture Co., supra.*

19. The withholding of and concealment of critical facts and documents, reliance on disclaimed testimony and the making of deceptive and false representations in briefs filed with the court, which is purposeful and done with a deceptive intent, is exceptional and justifies an award of attorneys fees in this case under 35 U.S.C. § 285, *L. F. Strassheim Co. v. Gold Medal Folding Furniture Co., supra; Skil Corp. v. Lucerne Products, supra.*

20. Under 35 U.S.C. § 285, this court has the discretion to award attorneys fees in exceptional cases and, under the circumstances of this case, the court concludes that this case is exceptional and defendants are entitled to attorneys fees in the amount indicated.

21. Courts have the inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," and may impose sanctions in furtherance of that power, *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734, 738 (1962), and may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, *F. D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129–130, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703, 714 (1974), *Vaughan v. Atkinson*, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 89, 91 (1962).

22. The signature of an attorney on a pleading constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief, there is good ground to support it, and that it is not interposed for delay, Rule 11, Fed.R.Civ.P.

23. The inherent power of a court to manage its affairs necessarily includes

the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it. *In re Sutter*, 543 F.2d 1030, 1037–38 (2nd Cir. 1976); *Flaksa v. Little River Marine Construction Co.*, 389 F.2d 885, 888 (5th Cir. 1968), *cert. den.*, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).

### JUDGMENT ORDER

The Court having considered defendants' motion for an order to show cause (filed on September 20, 1979), defendants' motion for an order to again direct plaintiff finally to comply with this court's prior orders or suffer dismissal (filed on January 21, 1980), and being fully advised, it is hereby

ORDERED, ADJUDGED AND DECREED:

1. The complaint as amended and claims of plaintiff for infringement are dismissed.

2. The defendants' counterclaim for declaratory judgment, as amended, is dismissed without prejudice as to the four patents in suit.

3. Defendants are entitled to costs in the amount of $6,250.30 and attorneys fees in the amount of $150,000.00. These sums shall be paid to defendants by plaintiff within 60 days.