**Francis H. WAGNER, Plaintiff,**

v.

**LEHMAN BROTHERS KUHN LOEB INCORPORATED and Stuart Travis, Defendants.**

No. 83 C 509.

United States District Court,
N.D. Illinois, E.D.

June 19, 1986.

Steven P. Gomberg, Ronald P. Kane, Siegan, Barbakoff, Gomberg & Gordon, Ltd., Chicago, Ill., for plaintiff.

Michael W. Coffield, David L. Carden, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for defendant Shearson Lehman Brothers/American Exp.

Richard J. Hoskins, Schiff, Hardin & Waite, Chicago, Ill., and Alan Kahn, Ralph Hochberg, Kahn & Hochberg, New York City, for Stuart Travis.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

This case is a securities action filed on January 29, 1983 by plaintiff Francis H. Wagner ("Wagner") as a putative class representative against defendant Shearson Lehman Brothers, Inc. ("Lehman") and defendant Stuart Travis ("Travis") to recover losses incurred while Travis was employed by Lehman as a registered representative and while he acted as a broker for Wagner. Wagner's complaint alleges that Travis churned his customers' accounts at Lehman to generate commissions and purchased securities on their behalf without consideration for their investment objectives and financial resources. Lehman allegedly either participated in, knew, or should have known of Travis's conduct but failed to supervise him properly. Wagner asserts that this conduct by Travis and Lehman violated Sections 10(b) and 20 of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, and the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1964. He also asserts pendent state claims of fraud and breach of fiduciary duty. Wagner's claims against Travis and Lehman are brought on his own behalf and as representative of the putative class of former Lehman customers whose accounts were handled by Travis while he was employed at Lehman from 1971 through 1982.

A flurry of motions were filed after the complaint, including a motion for class cer-

tification, two motions to disqualify plaintiff's counsel, a motion to substitute the executor of Wagner's estate as the class representative after Wagner's death, a motion to dismiss the complaint for Rule 11 violations, and a motion to impose Rule 11 sanctions against Lehman for filing one of the motions to disqualify counsel. The two motions to disqualify plaintiff's counsel are based on separate and independent facts. On May 2, 1983, Lehman filed its Motion to Dismiss and Disqualify Plaintiff's Counsel on the grounds that this action was improperly brought based upon information gained by Wagner and his counsel, Steven Gomberg ("Gomberg"), from Travis in return for a false promise of payment of money. On May 13, 1985, Lehman filed its Motion to Disqualify Plaintiff's Counsel based on: (1) the conflict of interest existing in the representation of plaintiff by his counsel, Ronald Kane ("Kane"), given Kane's substantial responsibility while employed by the Securities and Exchange Commission ("the SEC") for an investigation of defendants concerning Wagner's claims conducted by the SEC; and (2) the impropriety of Kane's conduct in contacting employees of the SEC, after he left its employ and appeared as plaintiff's counsel in this action, in an attempt to persuade the Commission to initiate an investigation of defendants. An evidentiary hearing was conducted from December 10 to December 16, 1985. Following the evidentiary hearing, the parties were instructed to prepare Proposed Findings of Fact and Conclusions of Law and to brief the motions. For the reasons stated below, this Court has decided to: grant the motions to disqualify plaintiff's counsel, Gomberg, Kane, and their law firm; deny the motion for class certification; deny the motion to substitute Lee Barbakoff, the executor of Wagner's estate, as the class representative; deny plaintiff's Rule 11 motion for sanctions; and deny the Rule 11 motion to dismiss the complaint.

### FACTS [1]

#### I. Genesis of this Lawsuit—Travis's Taped Statements.[2]

Approximately 18 months after he had closed his account with Lehman, on November 22, 1982, Wagner received a telephone call from Travis. Travis proposed that Wagner could recover the losses he had sustained in his account, allegedly in excess of $1.2 million, by suing Lehman for "misinformation, mismanagement and churning." (Wagner Dep. at 6–9.) Travis stated that he would give testimony to support those claims in exchange for 15 to 20 percent of any sum ultimately recovered by Wagner from Lehman. He further stated that no one was to know about their proposed financial arrangement and that if

1. The facts set forth herein are the facts this Court has found after the conclusion of the evidentiary hearing and are adapted from the Proposed Findings of Fact submitted by Lehman. Although it is arguably not necessary for this Court to set forth its findings of fact and conclusions of law on a motion to disqualify counsel pursuant to Fed.R.Civ.P. 52(a), this Court has chosen to do so in the format of this opinion. *See Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 102 (7th Cir. 1970).

2. Although the Court specifically granted the parties an opportunity for an evidentiary hearing on the facts set forth in this section (Tr., Dec. 16, 1985, at 135–38), the Court did not conduct such an evidentiary hearing because these facts are not in dispute and because neither party suggested that a hearing was necessary. Moreover, an evidentiary hearing was in fact unnecessary because Wagner and Gomberg could have presented no further evidence in favor of their position. This Court, for purposes of the first motion to disqualify and dismiss, has accepted Wagner's version as true. In particular, this Court has accepted as true Wagner's and Gomberg's assertion that the FBI tape recorded meeting of December 3, 1982 was instigated by the Assistant United States Attorney, who assured them that nothing they were doing was illegal. Virtually every fact set forth herein comes from Wagner's deposition testimony, or his notes of conversations with Travis, or the tape recording he made of his meeting with Travis, or from Gomberg's deposition. In addition to reviewing this material, the Court also listened to the FBI tape recorded meeting of December 3, 1982 between Wagner, Gomberg, and Travis described more fully below. Wagner has died, and Wagner and Gomberg admit that Travis can not be believed. Thus an evidentiary hearing on the facts set forth in this section would have served no purpose.

asked about it, he would lie. Travis indicated to Wagner during this conversation that he was emotionally depressed, that he was "finished" in the brokerage business, and that he was in dire financial straits. (Wagner Dep. at 10.) On November 23, 1982, the next day, Wagner contacted his attorney, Steven Gomberg of the law firm of Siegan, Barbakoff, Gomberg, Gordan & Elden, Ltd. ("the Siegan, Barbakoff firm"). Gomberg told Wagner to prepare notes of his conversations with Travis and to gather his trading records with Lehman.

Wagner was a self-made millionaire who invested extensively in the stock market. He began investing in stock in 1967. He engaged in a wide variety of securities transactions with numerous brokerage companies, sometimes simultaneously, and he monitored all of his transactions carefully. Travis was employed by Lehman from December, 1970 to February, 1982. Travis first contacted Wagner by phone in October, 1975, and as a result of that contact, Wagner opened two accounts with Lehman, a cash and margin account and an option account. On his New Account Form, Wagner indicated that at that time he had a net worth of $5 million and a portfolio valued at $4 million.

Wagner maintained his accounts with Lehman until April, 1981. During that time he purchased the securities of more than 60 corporations and traded heavily in more than 70 options. He profited by approximately $516,944 in his stock transactions, but he lost approximately $1,132,887 in his options trading. Wagner testified at his deposition that he had no personal knowledge of any wrongdoing by Lehman other than what Travis had told him.

Two days after the November 22, 1982 conversation, Travis called Wagner again to see whether Wagner had "started proceedings." (Wagner Dep. at 27–29.) Travis told Wagner that Lehman knew he was a "pathological compulsive gambler" before he started trading for Wagner and had

sent Travis to a psychiatrist. (Wagner Dep. at 29–32.) When Travis learned that no lawsuit had yet been filed, he again told Wagner to sue Lehman. In this conversation, Travis suggested that Wagner and his attorney should come to New York where Travis would go over "everything" and would "testify" on his behalf. (Wagner Dep. at 32; Wagner's notes at 5.)[3] Travis told Wagner that if asked his reasons for this testimony, he would:

> . . . answer by saying that he wants to do one last good favor for me. He will also say that he has remorse, wants to repent, and . . . a born again Christian.

(Exhibit I at 6.) In this second telephone conversation, Travis for the first time asked Wagner for an immediate payment of $20,000 to "hold him over." (Wagner Dep. at 33.) Wagner's response to this immediate request for funds was "to give the impression that I would do everything in my power to help him—." (Wagner Dep. at 34.) Accordingly, Wagner told Travis that he would "try to raise the money for him." (Wagner Dep. at 35.) Travis then stated that when the suit was settled, he wanted Wagner to give the money to his wife, and Wagner and Travis discussed how this could be done "without raising suspicion." (Exhibit I at 6.)

Following his conversations with Travis, Wagner and Gomberg met with a representative of the United States Attorney's office in Chicago, to whom they conveyed the Travis story. Wagner was then referred to the United States Attorney's office in New York, where Travis resided. Wagner and Gomberg met with an Assistant United States Attorney and an FBI agent in New York on December 2, 1982, at which time the Assistant and the FBI agent proposed that Wagner wear a concealed recording device to meet with Travis. Wagner agreed to this proposal. During this meeting, Wagner requested an opinion as to whether anything he was doing was illegal. The Assistant United

---

**3.** Wagner was instructed by Gomberg to prepare notes of his conversations with Travis. Wagner's notes of his conversations are attached as

Exhibit I to Lehman's brief and hereinafter will be referred to in this opinion as Exhibit I.

States Attorney assured Wagner that it was not.

Accordingly, Wagner and Gomberg met with Travis at his home on December 3, 1982. As noted above, prior to this meeting, Wagner had a recording device affixed to his body by two FBI agents. Upon his arrival at the Travis home, Gomberg absented himself from the room. (FBI Transcript at 13.)[4] Wagner then confirmed with Travis the "payment" arrangements they had previously discussed. Although Wagner apparently had no intention of paying Travis any money, he did attempt to induce testimony favorable to his case. Thus, the following exchange took place:

> Wagner: ... our understanding now is the fact that we get this thing going— I'll definitely take care of you on this one.

> \* \* \* \* \* \*

> Travis: I don't know if I can make it—I got $400 left.

> Wagner: Now listen, I'm working on this 20 grand.

> Travis: I don't need twenty, I need ten. I haven't paid my f_____ bills for two months, so I can hang, pal. But, if I can't have it in six months, Frank, I'll sign you a note for that. Trust me.

> Wagner: I trust you. I trust you.

(Exhibit J at 14, 16.) Once this arrangement was confirmed, Travis proceeded to talk with Wagner and his attorney about his alleged mismanagement of his customers' accounts.

Partway through the December 3 meeting, Gomberg persuaded Travis to permit an open tape recording of the proceedings. Travis consented to this "open" tape only after Gomberg promised that he would not "use that [tape] in court" and that Gomberg would give the tape to Travis if Wagner did not proceed with the lawsuit. (Exhibit J at 19, 25.) From the beginning of their meeting, Gomberg knew that Travis

was represented by counsel, but nevertheless allowed the meeting to continue.

During the ensuing conversation, Travis proceeded to tell Wagner and Gomberg that he suffered from a gambling addiction of which Lehman was aware and which caused him to trade heavily in customers' accounts for the sole purpose of generating large commissions. According to Travis, because of his need to earn large commissions, he never concerned himself with the suitability of particular investments for his customers. Rather, he placed high concentrations of the same security in accounts and then churned those accounts until they were wiped out. Travis stated that Lehman knew of Travis's gambling addiction, sent him to a psychiatrist, took control over Travis's personal finances, but allowed him to continue handling accounts.

Travis also repeatedly referred to his desperate financial situation. He told Wagner, "I'm going bankrupt. I'm very sad. I can't pay my mortgage." (Exhibit J at 24.) Travis elaborated on his troubles as follows:

> I mean, I'm in debt now for a million dollars. I'm personally in debt now for a million dollars. I'm about to go bankrupt. I'm in debt, I'm overdrawn on my checking account $166,000 in Chemical Bank, okay, from horses.

> \* \* \* \* \* \*

> If you decide to sue me, fine, sue me. I'm judgment proof. I'm broke. I have no money. I'm on my last vestiges. My assets are in my pocket, $400. I went to the track yesterday, blew my last $8,000.

(Exhibit J at 41, 50.) Travis also confessed that he "owe[d] a shylock $30,000." (Exhibit J at 99.)

In addition, Travis made a variety of statements that clearly revealed his troubled mental state. Thus, he told Wagner and Gomberg:

---

**4.** The transcript of the FBI tape is attached to Lehman's Brief as Exhibit J and hereinafter will be referred to in this opinion as Exhibit J.

Ah, I just feel the pressure's getting to me and I may be ready for a nervous breakdown....

(Exhibit J at 28.) Towards the end of the meeting, Travis repeated:

I will tell you the reason I'm doing this is to get it off my chest because I'm about to have a nervous breakdown. And my wife's very uptight because to be candid with you, as bad as I might sound, I am.

(Exhibit J at 73.)

Travis also assured Gomberg that his motives for testifying were pure and that no financial incentives were involved. At the beginning of the meeting, while Gomberg was in the bathroom, Travis told Wagner that he would tell Gomberg that "there's no arrangement between us, none whatsoever." (Exhibit J at 18.) Gomberg, of course, was aware of the financial incentives from the outset.

According to plan, therefore, Travis immediately told Gomberg that "there's no money coming between me and Frank." (Exhibit J at 21.) Instead, Travis stated:

... the reason this meeting's taking place is that Frank had said he was thinking of suing Lehman Brothers and he would like, you know, the truth about the handling of his account prior and ... I feel telling this will make me feel a little bit better.

(Exhibit J at 28.)

Travis repeated the theme that the meeting was taking place at Wagner's request and because of Travis's concern for Wagner:

[Y]ou came to me, you wanted to sit down and talk to me before you sue Lehman. You wanted to know my feelings on how I handled Frank's account. I am telling you candidly, I let you come to my house because I felt bad cause Frank is absolutely dying. Physically he looks much better, but he's been very sick. And there was a time that he thought he wouldn't make it, and this was his life savings. When a guy tells me that, I'm sensitive enough to say "Frank, let me tell the truth." When he called me, he said, "Stu, is there any-

thing you could say?" I said "Frank come to my house with your lawyer. I will tell the truth."

\* \* \* \* \* \*

*I want you to know I did not call Frank to do this. I want you to know I did not tell Frank to do this. I want you to know Frank called me.* And he said, "Stu, I've looked over all the trading through the years and I've got to tell you I'm sick about it because my whole life savings is down the drain." He said, "I'm thinking about suing you. Don't take it personally." I said, "Frank, bring your lawyer to my home and I will tell you the truth from top to bottom." *That's how this all—this is not—I'm not being paid for this, I don't want anything from it.*

(Exhibit J at 81–83; emphasis added.)

At the end of the meeting, Gomberg told Travis that he was a "sick guy" who had "impeached [his] own credibility" and whose reputation was "worthless" (Exhibit at 97, 102, 114). Travis asked Gomberg his opinion on the value of his story to force a rapid settlement:

Travis: ... Now, how, how hot is this?

Gomberg: I think there—I think it's a fall down. I don't even think I have to file suit. I figure if I walked in there and said "Here, I want you to listen to a song," I think they'd fall over dead. I think they're open for a class action. I think they're open for racketeering, federal racketeering charges as well as the normal security charges. I think they've had the most profitable quarter in history.

(Exhibit J at 94.) Gomberg's mention of a possible class action against Lehman obviously troubled Travis because he stated:

... well, you're bringing class action. I mean, we're going to get this out of whack. I mean, we don't want to—if you can settle with them, wouldn't it be better?

(Exhibit J at 102.) Gomberg reassured Travis that a quick settlement was what he was interested in as well:

Well, class action, I don't want to try a class action. It's costly. It takes a—I want to settle. I want a quick—I want this thing to be settled within six weeks. (Exhibit J at 103.) Gomberg went on to reassure Travis that he was "not interested in any other customers. I'm interested in Frank." (Exhibit J at 109.)

Travis wanted to know "How long you think before you go to Lehman?" (Exhibit J at 100.) Gomberg replied that he would approach Lehman around the first of the new year. Travis also asked what Lehman's reaction would be when Gomberg played the tape of the December meeting for Lehman's attorneys, to which Gomberg responded:

> Gomberg: I think they're going to fall right down. I think—I'm going to say, you pay a million and half now, or I'll file suit. They'll be initial notoriety. The Journal will pick it up. Everyone else will pick it up. Someone's ready to jump on Air Florida. As a matter of fact, I've got another case ready to go up—
>
> Travis: Forget about that. I gave you more information that you could—I don't know if I'm right on that.
>
> Gomberg: Okay. Well, you haven't said anything that hasn't been presumed by others. "Either you're willing to pay the 1.5 or whatever the figure is now or"—
>
> Travis: Oh, it's going to be bigger.
>
> Gomberg: —"or it's going to be treble damages. It's going to be a class. It's going to be—I'm going to go after every customer you ever had and I'm going to pull 'em into this thing." And we're talking about forty or sixty million, or whatever. Now it's up to them....

(Exhibit J at 106–107.) The December 3, 1982 meeting was concluded after Travis and Gomberg agreed to meet at Travis' attorney's office so that Gomberg could question Travis further before a court reporter.

After the December 3, 1982 meeting, Travis called Wagner repeatedly to press him to obtain a quick settlement: "Travis was extremely—repeated many, many times about the possibilities of a quick settlement in this case...." (Wagner Dep. at 154.) Indeed, at one point Travis "went into a hysterical tirade" and said "he was finished ... and he felt he might as well commit suicide." Wagner continued to lead Travis to believe that he "was doing everything he could to help him." (Wagner Dep. at 159, 163–64.) Accordingly, Travis asked Wagner to "get a hold" of Gomberg to arrange the second session before the court reporter quickly. That session took place in New York at the office of Travis's counsel on December 17, 1982.

During the December 17, 1982 session, Travis reiterated in large part the statement he gave to Wagner and Gomberg at his home on December 3, 1982, although he "toned it down" somewhat. Lehman, of course, was never advised that this session before a court reporter was taking place and was never given the opportunity to attend and cross-examine Travis. Travis never signed the transcript of this statement.

Consistent with his desire to effectuate a "quick settlement" for Wagner, on January 6, 1983, Gomberg telephoned Saul S. Cohen, then General Counsel of Lehman, and explained that he was in possession of tapes of various conversations with Stuart Travis which he proposed to play for Mr. Cohen in an effort to "settle" the case.[5] Mr. Cohen declined this suggestion, stating that he had no interest in Mr. Gomberg's proposal. In his affidavit, Mr. Cohen recounts that he was deeply offended by "what appeared to ... [him] to be an attempt by Mr. Gomberg to sell the tapes to Lehman Brothers."[6] Wagner subsequently filed this lawsuit against Lehman on

---

5. The tapes Gomberg referred to did not include the "FBI" tape, the only tape that referred to the payoff arrangements, because Gomberg did not receive the FBI tape until March 25, 1983.

6. A copy of Mr. Cohen's April 29, 1983 affidavit setting forth his conversation with Gomberg of January 6, 1983 is attached as Exhibit N to Lehman's brief.

January 25, 1983. Travis was also named as a defendant.

Despite being named as a defendant in the lawsuit, Travis continued to telephone Wagner after January, 1983, still blind to the fact that Wagner's promises of financial compensation were false. Wagner at this point "had purposely put a policy in effect to avoid taking any calls from Mr. Travis any further." (Wagner Dep. at 250.) On one occasion, however, he was unable to avoid the call, but told Travis that he was "not going to talk to [him] any further." (Wagner Dep. at 251.) At this point, Travis:

... just absolutely blew his stack. And he said, "Now wait a second." He said, "I am getting very"—these are all words to this effect—"I am getting very uptight about this whole thing."

He said, "If you and your lawyer are thinking of hanging me out to dry ... you got another guess coming."

\* \* \* \* \* \*

... he said, "Make up your mind; that if you don't cooperate with me, [n]either you or anybody else are going to get a penny out of this."

(Wagner Dep. at 251–52.)

Wagner testified that his final conversation with Travis took place in April, 1983. In this conversation, Travis said, "Frank, Frank.... We lost." (Wagner Dep. at 254.) Wagner replied, "What do you mean, we lost?" Travis responded:

"You lost, I lost." He said "We all lost." He said, "They taped us both." With that, I put the phone down.

That was the last of any conversation I had with Travis.

(Wagner Dep. at 254.)

II. *Ronald Kane's Involvement with the SEC Inquiry of Travis and Lehman.*[7]

On January 26, 1983, one day after Wagner filed this action, the Securities & Exchange Commission's ("SEC") Chicago Regional Office ("CRO") initiated a Matter Under Inquiry ("MUI") regarding Travis, designated MC–303. The SEC learned of this lawsuit through an article in the Chicago Sun Times. As the MUI Opening Form indicates, Stuart Travis was the subject of the inquiry, and Lehman was designated a "related party" to the investigation. MC–303 was assigned to Thomas Huber, then a CRO staff attorney in one of the two enforcement branches under the supervision of Ronald P. Kane, an Assistant Regional Administrator ("ARA") for enforcement matters in the CRO. Kane held this position throughout the period of the SEC's investigation of Travis and the allegations in the Wagner complaint.

After opening MC–303, on January 26, 1983, Huber contacted Gomberg, informed him that the SEC had opened an inquiry concerning Travis, and asked for a copy of the complaint in this case. By letter of the same date, Gomberg provided a copy of the complaint to Huber.

According to William Goldsberry, Regional Administrator of the SEC's Chicago office, in his capacity as ARA Kane supervised Mr. Huber and was charged with responsibility for the inquiry of Travis and Lehman. Because Kane was Huber's supervisor, Kane had official responsibility for the matters assigned to Huber which were subject to Kane's supervision.[8] Although MC–303 was a relatively insignificant matter under inquiry in the SEC's CRO, the entire investigation of which took approximately 24 hours of SEC attorney time, it was nevertheless significant enough to warrant inquiry within the SEC's auspices.

It is undisputed that Kane personally participated in two quarterly case reviews

---

**7.** The evidentiary hearing conducted by this Court from December 10 to December 16, 1985 was directed primarily to Lehman's motion to disqualify as a result of Kane's involvement with the SEC inquiry of this matter. The facts presented in this section are the facts this Court has found at the conclusion of the evidentiary hearing.

**8.** Goldsberry's conclusion is consistent with the SEC's conclusion that Kane had official responsibility for MC–303 and personally participated in MC–303, as set forth more fully below.

as part of his supervisory responsibilities. The purpose of the quarterly case reviews was to "ascertain what [the staff] had done since the date of the last case review ... where they were going with the case, and what they planned on doing in the next several months." (Goldsberry Tr. at 15; Kane Tr. at 4.)[9] Apparently no one who was present at these case reviews recalls what was discussed or the length of the discussion, although based on the number of matters discussed during each review, each discussion on MC–303 probably lasted no more than five minutes. Based on Kane's notes of the case reviews, which he had typed, circulated, and placed in a three-ring binder, during the first meeting, Kane concurred in a decision to continue monitoring the private action, and, during the second meeting, Kane concurred in a decision to close the matter.[10] Accordingly, the Court finds that Kane took part in the SEC's deliberative process regarding MC–303 and thus personally and substantially participated in MC–303.

Although there is some dispute as to the extent and nature of the confidential, non-public information concerning defendants either engendered by or disclosed to the SEC by the MC–303 inquiry, this Court finds that such information was disclosed to the SEC by counsel for Lehman pursuant to an agreement that it would be kept confidential. Even if Kane did not receive this information directly, there is no dispute that he had access to it merely by going to the SEC file on MC–303 or by asking Mr. Huber.

On Friday, October 19, 1984, Kane resigned from the CRO to enter private practice with the Siegan, Barbakoff law firm. Three days later, on Monday, October 22, 1984, he filed his appearance in this action on behalf of Wagner and his firm.

Less than one month before he resigned from the SEC, Kane knew or should have known that the SEC had some interest in this case, a case on which he knew he would be working when he entered private practice with the Siegan, Barbakoff firm. Shortly after Kane announced that he would join that firm, Stanley Whitten, the CRO's chief investigator who reported to Kane and who was and is a personal friend of Kane's, received a partial copy of the complaint in this action from an employee of the United States Postal Criminal Investigation Service. Within a day or two of receiving the Wagner complaint from this employee, Whitten told Kane that he had been given a copy of a complaint filed by the very law firm which Kane had announced he would be joining upon leaving the SEC. Whitten told Kane that the complaint had "mysteriously" appeared on his desk and "here you [Kane] haven't even left the Commission, and you are already at work with your new law firm." (Whitten Tr. at 465.) Kane admitted to Whitten that the complaint had been filed in a case on which he would be working when he left the SEC. Despite this conversation, Kane did not attempt to determine whether the CRO was or had been investigating the facts of this case.

Before Kane left the SEC, he and Gomberg had discussed his joining the Siegan, Barbakoff firm on six occasions and discussed the cases on which Kane would be working when he would join the firm. Although Gomberg denies that he was aware that the SEC had been investigating this matter, this Court finds that Gomberg knew or should have known of that inquiry. Huber so informed him as early as January 26, 1983; he sent Huber a copy of the complaint in this case; and Lehman's counsel referred to an ongoing SEC investigation into the facts of this case no fewer

**9.** The transcript references in this section of the opinion refer to the transcript of the hearing conducted by this Court on December 10 to 16, 1985.

**10.** Kane places great significance on the fact that he did not actually sign the Closing Memorandum dated January 24, 1984. William Goldsberry, the Regional Administrator of the SEC and Kane's boss, testified however that Kane's failure to sign the Closing Memorandum was of no significance because it appeared to him that the decision was made at Kane's November 10, 1983 case review to close the matter.

than six times during a hearing before Judge Grady of this Court on May 11, 1983.

Despite this knowledge, Gomberg made no attempt to determine whether Kane was involved in the SEC inquiry of the circumstances of this case. Nor did Kane advise Gomberg of the matters on which he had worked while employed by the SEC except for a criminal proceeding on which he had spent substantial time and in which Kane had been appointed Special Assistant United States Attorney. Although both Kane and Gomberg explain this failure by pleading a lapse of memory, after having observed the demeanor of these witnesses at the hearing, this Court finds that explanation to be inherently incredible.

This conclusion is strengthened by Kane's contacts regarding this matter, Lehman, and Travis with the SEC after he joined the Siegan, Barbakoff firm. Within a week of joining that firm, Kane began an effort to encourage the SEC to investigate Travis.[11] Kane had at least 14 contacts with his friends and former associates at the SEC regarding Travis, Lehman, or Travis's current employer, the firm of D.H. Blair in New York. Gomberg was fully aware of Kane's subsequent contacts with the SEC.

Kane's first contact with the SEC was on the morning of October 24, 1984, when he telephoned Anne Flannery, Assistant Regional Administrator of the SEC's New York Regional Office. He told her he was a former CRO employee and counsel for plaintiff in an action against Travis and Lehman and that he had received information about possible securities law violations by Travis at D.H. Blair.

The second of Kane's series of contacts with SEC employees regarding defendants was in late October 1984, when he telephoned his friend in the CRO, Stanley Whitten, to arrange a lunch. Kane told Whitten that he wanted to discuss a situa-

tion that might be of enforcement interest and that had come to Kane's attention as a result of a case on which he was working. Kane and Whitten had lunch on November 1, 1984.

At the lunch, Kane discussed this litigation and related to Whitten that:

... he was working on a case involving an individual ... name[d] Wagner ... gave me basically an overview of the case he was working on and indicated that in the course of working on this case that some information had come to his attention that Stuart Travis was apparently involved currently ... in what appeared to be ... violations of the Federal Security (sic) laws in his employment of D.H. Blair, and that this actually had come to him as a result of some informant that had provided him some information. It was my understanding the information was written ... and that in his view *it would be really a very interesting enforcement matter.*

... he had a yellow legal pad piece of paper in which he had five, I think it was, stocks written down *and two names of individuals who ostensibly were nominees for Mr. Travis.* And he explained to me that the information he had received was that these five stocks were being manipulated by Mr. Travis at D.H. Blair *and that in conjunction with that manipulation of these stocks, that these two names were being used as phony accounts there....*

(Whitten Tr. at 467–68; emphasis added.) Whitten added that Kane allegedly told him the Wagner case would not be of interest to the CRO because it only involved one individual and the facts were too old. (Whitten Tr. at 468.)

Kane gave Whitten a handwritten piece of paper that listed four or five stocks and two nominee accounts involving Stuart Tra-

---

11. MC–303, the inquiry into Travis' conduct at Lehman, was formally closed on January 24, 1984. Counsel for the SEC informed this Court at the December, 1985 hearing, however, that the SEC's New York Office opened an inquiry concerning Travis's activities at D.H. Blair on March 18, 1985. According to the SEC, this inquiry was unrelated to Kane's communications with the SEC's staff or to the MC–303 inquiry of the CRO. The New York Office inquiry was closed on June 28, 1985.

vis and D.H. Blair. The stocks listed allegedly were being manipulated by Travis at D.H. Blair through the use of the very same nominee accounts that Wagner alleges were used by Travis to manipulate the market while he was at Lehman. Thus Mr. Kane testified:

> It is true we had been given information from the informant that he [Travis] was using nominee accounts at D.H. Blair and the informant told us he thought he had been using *the same nominee accounts at Lehman Bros.*

(Kane Tr. at 211; emphasis added; *see also* Kane Tr. 211–12, 213.) Kane also told Whitten that Travis was engaging in conduct at D.H. Blair similar in nature to the conduct that he had engaged in while employed at Lehman. (Whitten Tr. at 470; Kane Tr. at 206–08.)

Kane subsequently admitted in a pre-trial conference before this Court that it would be "helpful" to Wagner to show that Travis was using the nominee accounts at D.H. Blair to manipulate the market and that he used these same accounts at D.H. Blair for the same purpose:

> We had also been given information that Mr. Travis had previously at Lehman Brothers used nominee accounts to personally benefit from the way he traded Securities and that *he was using the same nominee accounts at D.H. Blair.* We have never been able to pin down the nominee accounts at Lehman Brothers, but *it would be helpful to us to see if we could get that information from Blair.*

(Tr. of Pre-trial Conference, Dec. 9, 1985, at 38; emphasis added.)

Later in the day of his November 1, 1984 luncheon with Kane, Whitten entered Travis's name into the SEC computer to determine whether "there had been any prior interest in Mr. Travis by the Commission." (Whitten Tr. at 473.) After entering Mr. Travis' name into the computer, Whitten discovered that an inquiry regarding Travis, designated MC–303, had in fact been pending in the Chicago Office and was closed in January, 1984.

Because Whitten's discovery of the existence of MC–303 led him to question whether it concerned Wagner, he went to the file room and pulled the Closing Memorandum for MC–303, and determined it was a recommendation from Huber and Kane to close the inquiry. Whitten immediately telephoned Kane and said:

> "Ron, *I've looked into some of the information that you gave me,*" and I said, "*I would like to tell you that Stuart Travis and his Lehman Brothers activity I found very interesting* because here at lunch you were telling me what a great case you were working on." And I said, you know, "How quickly you've changed since your (sic) gotten into private practice." I said, "when you were at the Commission this case was a big nothing, as evidenced by the fact that I found a closing report in the—in the file room *that indicated that it was closed by you.*"

(Whitten Tr. at 478–79; emphasis added.)

Whitten's discovery caused Kane quickly to focus on his potential conflict of interest. Kane admitted that he was "concerned" about Whitten's discovery. (Kane Tr. at 169.) Kane then told Whitten that he was out of the office in January, 1984, and asked Whitten to check the Closing Memorandum for its date. After doing so, Whitten telephoned Kane to say that it was dated January 24, 1984 and that Kane's initials did not appear on the memorandum. Kane then indicated he had been in St. Louis on that date. By this time, Whitten also had focused on Kane's potential conflict. Kane then told Whitten that to "play it safe," he was going to call Mr. Goldsberry regarding the matter. (Whitten Tr. at 483.) Kane never did so.

Kane had additional reason to question the extent of his role in MC–303. Following his two telephone conversations with Kane on November 1, 1984, Whitten related the substance of his conversations with Kane to Joyce Glynn, Kane's successor as ARA, who, during the pendency of MC–303, had been the branch chief of the enforcement branch to which Huber was as-

signed. Whitten told Glynn that after his lunch with Kane concerning Travis, he had returned to the office and "found that it was a matter that had already been looked at by the Chicago Regional Office and closed," and that Kane had expressed "concern" about the matter. On the next day, November 2, 1984, Ms. Glynn checked Kane's records to determine whether he had discussions with anyone concerning MC–303 and discovered "during at least two of the case reviews *that Mr. Kane was responsible for* ... had discussed Stuart Travis MC–303." (Glynn Tr. at 418; Kane Tr. at 168.) Ms. Glynn then telephoned Kane because she thought he might be interested in the information in deciding what action to take. Glynn also informed Kane at this time that he had taken notes during the November, 1983 case review which reflected that the investigation was "to be closed." (Kane Tr. at 168; Glynn Tr. at 420.)

Kane made no attempt whatsoever to address the potential conflict with either the SEC, counsel for defendants, or this Court even after he received all this information regarding his role in MC–303. Instead, he and Gomberg met and allegedly determined themselves that there was no conflict of interest.

Kane had several subsequent contacts, both with Whitten and with Richard V. Norell, a friend and former supervisor of Whitten's in the SEC's Washington Office, to whom Whitten had referred Kane. Kane had lunch with Norell in Washington, during which he gave him the same information he had given to Whitten, including the allegation that Travis was using the same nominee accounts at D.H. Blair that he had purportedly used at Lehman. He also provided him a copy of the transcript of the FBI tape of the December 3, 1982 meeting.

On February 26, 1985, Judge Broderick of the United States District Court for the Southern District of New York quashed a subpoena Kane had prepared and served upon D.H. Blair. That subpoena asked for, *inter alia*, Travis's Form U–4, the Uniform Application for Securities Industry Registration form. A U–4 form lists background information about a registered representative. Kane had called Whitten prior to preparing the subpoena to ask "how to accurately describe a broker/dealer document" for the subpoena. (Whitten Dep. at 252–54, 514–15.) [12] Judge Broderick ruled that the documents sought were irrelevant to this case.

After a few more incidental conversations with Kane regarding Travis, Whitten spoke with Norell of the SEC's Washington Office about Travis. During this conversation, Whitten informed Norell that he might be going to D.H. Blair on a matter completely unrelated to the Travis matter, and that if he had not taken a look at the D.H. Blair records with respect to the material "that Mr. Kane had brought to his attention," that Whitten would be more than happy to do it. (Whitten Tr. at 513.) On March 14, 1985, Whitten visited D.H. Blair's offices in New York and obtained a copy of Travis's U–4 form, one of the very documents to which Kane had been denied access by Judge Broderick on February 26, 1985. That same evening, Whitten met Norell for dinner and provided to him a copy of Travis's U–4 form and also the names of the three individuals to contact provided to Whitten by D.H. Blair. The next day, Whitten contacted another SEC employee, Thomas Valery of the SEC's New York Office, regarding either Travis, D.H. Blair, or Lehman. On March 18, 1985, the SEC opened its investigation of Travis.

Kane received a telephone call on the day after Whitten appeared at D.H. Blair from Richard Hoskins, Travis' counsel, who had learned of Whitten's visit to D.H. Blair and telephoned to ask Kane whether he had

---

**12.** This Court finds that Whitten's later attempt to retract this testimony at trial by explaining that his conversations with Kane concerned, *inter alia,* a matter involving "Bache" or "Oppen-heimer" is not credible. Indeed, even Kane did not support Whitten's new version during Kane's testimony.

had any contact with the SEC regarding Travis. Kane flatly denied having had such contacts. Kane told Hoskins unequivocally that "there have been no contacts and certainly none today between this office and the SEC that has anything to do with your client [Travis]." (Hoskins Tr. at 128.) Hoskins made a contemporaneous memorandum of his telephone conversation with Kane on March 14. (Defendants' Exhibit 6, Memorandum to File dated March 15, 1985.)

As noted above, Kane had had numerous contacts with Whitten, Norell, Glynn, and Flannery, two of which had occurred only one to two weeks earlier. Kane testified, however, that Hoskins asked him only whether he or anyone at his firm were having discussions with the SEC and that he replied that his firm was, to the best of his knowledge, having no "ongoing" discussions with the SEC. (Kane Tr. at 133–34.) This Court finds Kane's testimony on this point to be not credible.

After a few more contacts between Kane, Whitten, and Norell, the SEC commenced an inquiry concerning Travis in its New York office on March 18, 1985, following Whitten's visit to D.H. Blair. As a result of the SEC's inquiry and some recent adverse publicity concerning Travis, Travis resigned from D.H. Blair's employ after working for D.H. Blair for over one year, during much of which time he was in charge of D.H. Blair's sales force.

Lehman's counsel first became aware of Kane's prior employment with the SEC in late January, 1985, upon receipt of the transcript of the hearing before Judge Grady on January 4, 1985 concerning Wagner's class certification motion. That transcript mistakenly gave as Mr. Kane's current employment his former position with the SEC. After learning that Kane had served as ARA for enforcement matters at the CRO, Lehman's counsel attempted to determine whether Kane had had any involvement with the earlier investigation of Lehman,

Travis, and Wagner undertaken by the SEC, in which Lehman had cooperated. The precise details of their efforts in this regard are the subject of Wagner's Rule 11 motion for sanctions, but they need not be recounted here except to note that neither Kane nor Gomberg voluntarily cooperated with that effort. Indeed, Kane's responses in this regard can be charitably characterized as evasive.

On May 15, 1985, defendants filed a second motion to disqualify, this time seeking to disqualify Kane and the Siegan, Barbakoff firm as a result of Kane's prior employment by the SEC and involvement in MC–303. Wagner's Rule 11 motion for sanctions against Lehman and its counsel, Michael Coffield and David Carden of the law firm of Coffield, Ungaretti, Harris & Slavin, soon followed.[13]

Finally, on May 24, 1985, Wagner, the named plaintiff in this case, died. On June 13, 1985, Lee R. Barbakoff, Wagner's personal attorney and a named partner in the Siegan, Barbakoff firm, was appointed executor of his estate. On September 4, 1985, Gomberg and Kane filed a motion to substitute Mr. Barbakoff as a party plaintiff and class representative in this case.

### DISCUSSION

Lehman contends that Gomberg and Kane and the Siegan, Barbakoff firm, should be disqualified on two separate bases: first, Gomberg's and Wagner's conduct regarding the December 3 taping of their meeting with Travis and the ensuing activity leading to the filing of this lawsuit violated at least two disciplinary rules of the ABA Code of Professional Responsibility as well as Rule 11 of the Federal Rules of Civil Procedure; and second, Kane's conduct in representing the plaintiff in this case, given his involvement with the SEC's inquiry about this matter, violated the ABA disciplinary rules, the SEC's rules, and a criminal statute. Each of these bases, as well as the related issues of the impact of

---

**13.** The Rule 11 motion is not directed at defendant Travis or his counsel, Richard Hoskins, although Wagner suggests that if this Court so determines, sanctions could properly be entered against them as well.

this conduct on the class certification and Rule 11 motions, will be discussed below.

I. *Disqualification For Conduct Relating to the Origin of this Case.*

Although Gomberg's conduct from the inception of this case and throughout the subsequent proceedings is sufficient in itself to require disqualification, this Court is particularly concerned by his role in the December 3, 1982 tape recorded meeting between himself, Wagner, and Travis. After a review of all the facts, this Court concludes that he has violated at least two of the disciplinary rules of the ABA Model Code of Professional Responsibility and of the Illinois Code of Professional Responsibility, *Ill.Rev.Stat.* ch. 110A, Rules 1–101 to 9–102 (1981).[14]

 DR 7–109(C) provides in pertinent part:

A lawyer shall not pay, offer to pay or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case.

Wagner's promise to remit up to 20% of any of his potential recovery in this case to Travis for his testimony was contingent upon the outcome of this case. There is no question that Gomberg, at the least, was aware of this arrangement between Wagner and Travis even before the taping of the December 3, 1982 meeting began. Indeed, he prearranged with Wagner to absent himself from the room for a short time so that Wagner and Travis could discuss the financial arrangements. Thus, Gomberg clearly violated DR 7–109(C).

Wagner responds briefly in Gomberg's defense by raising two points. First, he asserts that neither Gomberg nor Wagner

ever intended to pay Travis any money for his testimony. It makes no difference that Gomberg and Wagner never intended that money actually change hands because the effect on the potential witness is the same: he is induced by the promise of potential payment to give testimony he otherwise might not have given. Moreover, the effect on the integrity of the judicial system is the same: the witness's testimony is inherently unreliable because of the promise of payment. As stated by one court long ago:

Payment to [induce] a witness to testify in a particular way, payment of money to prevent a witness's attendance ... and the payment ... to make him sympathetic ... are all payments which are absolutely indefensible.... *The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true.*

*In re Robinson,* 151 A.D. 589, 136 N.Y.S. 548 (1912), *aff'd,* 209 N.Y. 354, 103 N.E. 160, (1913) (emphasis added); *see In re Kien,* 69 Ill.2d 355, 14 Ill.Dec. 365, 368, 372 N.E.2d 376, 379 (1977) ("[W]e will not tolerate payments of any sum of money by an attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise" (attorney suspended for 18 months).) This conduct, or acquiescence in such conduct by Wagner, violates DR 7–109(C).

Second, Wagner contends that his and Gomberg's conduct regarding the December 3, 1982 taping of Travis was "at the behest of the United States Attorney's Office and the F.B.I." (Plaintiff's Brief at 54.) Wagner contends that because the

14. On June 3, 1980, the Illinois Supreme Court officially adopted the Illinois Code of Professional Responsibility. The Illinois Code was modeled after the former ABA Model Code of Professional Responsibility. Most disciplinary rules in the Illinois Code are identical to the provisions in the former ABA Model Code. Thus, this opinion will refer only to the former ABA Model Code unless the Illinois Code differs in some material respect, which will then be

noted. Also, in August, 1983, subsequent to the events in question, the ABA adopted its Model Rules of Professional Conduct. The Illinois Supreme Court has not, however, adopted the Model Rules of Professional Conduct. In any event, the provisions of the Model Rules of Professional Conduct do not alter the professional responsibilities of plaintiff's counsel here. *See, e.g.,* Model Rules 3.4(b) and 4.2.

Assistant United States Attorney approved the taping and assured them that their cooperation with a governmental investigation could not be construed in any way as an illegal act, "[t]o apply DR 7–109(C) to Gomberg's conduct in this case would subject an attorney to professional jeopardy by cooperating with governmental investigations of criminal activity." (Plaintiff's Br. at 55.)

This Court disagrees. First, it is simply not true that Wagner agreed to pay Travis for his testimony only at the "behest" of the Assistant United States Attorney and the FBI. Wagner testified in his deposition that he told Travis he would pay him for his efforts during Wagner's very first conversation with Travis on November 22, 1982, and he reiterated this agreement two days later after having spoken with Gomberg. (Wagner Dep. at 6–9, 27–35.)

Second, this Court cannot condone plaintiff's effort to invoke governmental involvement to justify clearly unethical conduct. The assurance of the Assistant United States Attorney to Wagner and Gomberg that their cooperation could not in any way be construed as illegal—if indeed such an assurance was ever made—does not immunize Wagner and Gomberg from the consequences of their conduct in the civil context. Although it may be that their conduct was not "illegal" in a criminal sense, it was certainly a violation of the ethical canons of which Gomberg, at least, as an experienced and licensed attorney, should have been aware. Moreover, there is no indication in the record that the United States Attorney's Office was aware, at the time the Assistant purportedly rendered this opinion, that Gomberg and Wagner were planning to use the FBI tape of the December 3, 1982 meeting to further their own personal gain through a civil law suit. Gomberg himself testified that the extent of his and Wagner's conversation with the Assistant United States Attorney regarding a civil action was limited to the following:

It was simply that there was a possibility, given the information warranting,

that we would pursue civil action against Travis and/or Lehman Brothers if the evidence and information warranted it.

(Gomberg Dep. at 38.) Thus, the Assistant United States Attorney's opinion was limited to the criminal context, and, in any event, is not binding on any federal court. Where private parties engage in unethical conduct to redress their own private civil disputes, that conduct is not magically sanitized by the invocation of the involvement and approval of law enforcement authorities. To hold otherwise would be to abdicate the court's responsibility to monitor and ensure the ethical conduct of attorneys appearing before it to law enforcement authorities. Law enforcement agencies simply are not instruments for the resolution of civil disputes.

■ Gomberg's conduct during the December 3, 1982 taping also violated at least one more disciplinary rule, DR 7–104(A). DR 7–104(A) prohibits unethical communications with a person of adverse interests and provides:

(A) During the course of his representation of a client a lawyer shall not

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

From the very beginning of the December 3, 1982 taped session with Travis, Gomberg was aware that he was represented by an attorney and that Travis had sought the advice of this attorney regarding this matter. Without obtaining that attorney's consent, Gomberg proceeded with the taped session and indeed went so far as to render legal advice to Travis. Gomberg's conduct in this regard clearly violates DR 7–104(A).

Gomberg attempts to extricate himself from this situation by arguing that "Travis admitted to Wagner on December 3, 1982, before the meeting began, that his attorney (Hochberg) knew of the meeting and, presumably chose not to attend." (Plaintiff's Br. at 55.) Travis, however, stated during the December 3, 1982 meeting: "my lawyers told me not to talk. And I'm talking to you." (Exhibit J at 108.) Moreover, DR 7–104(A) does not permit Gomberg to "presume" that Travis's attorney chose not to attend the meeting. Nor does it permit Gomberg to further "presume" that Travis's attorney had given him consent to interview Travis about a lawsuit Gomberg intended to bring against Travis. Nor does it permit Gomberg to "presume" that Travis's attorney gave him consent to give his client legal advice.[15] As to the first two "presumptions" that Gomberg would have this Court imply, DR 7–104(A)(1) expressly requires the "prior consent of the lawyer representing such other party."[16] As to the third, even if Gomberg was unaware that Travis was represented by another attorney, he could not render legal advice to Travis because he must have been aware that Travis's interests had "a reasonable possibility of being in conflict with the interests of his client." DR 7–104(A)(2). In-

deed, Wagner subsequently sued Travis in this case as a defendant.

Finally, Wagner's and Gomberg's conduct with regard to filing this action may have violated Fed.R.Civ.P. 11 as well. When the complaint in this case was filed on January 25, 1983, Rule 11 provided in pertinent part:[17]

> The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false....

In January, 1983, Rule 11 required attorneys to have a good faith belief that the claims they alleged in civil actions were supported by good grounds. *Rhinehart v. Stauffer*, 638 F.2d 1169, 1171 (9th Cir. 1979); *Freeman v. Kirby*, 27 F.R.D. 395, 396–97 (S.D.N.Y.1961).

Lehman's Rule 11 motion is directed both to Gomberg's conduct and to Wagner's conduct. As to Gomberg, Lehman points to two distinct violations, the first of which applies to Wagner as well. First, Lehman claims that Gomberg and Wagner both filed this complaint knowing that it was

---

**15.** Gomberg advised Travis, *inter alia,* to allow the second tape recording of his conversation for Travis's protection and others; to go to the SEC with his story; and to disclose the story to others because "the more people that know" the safer Travis would be. (Exhibit J at 108.)

**16.** *See ABA Comm. on Professional Ethics and Grievances,* Formal Op. 108 (1934) (an attorney representing a plaintiff may not interview the defendant, in the absence of his counsel, concerning the facts of the case even if the defendant is willing to discuss the matter; such a prohibition is essential to protect the attorney-client relationship); *see also Kearns v. Fred Lavery/Porsche Audi Co.,* 573 F.Supp. 91, 95–6 (E.D. Mich.1983) (for purposes of DR 7–104(A)(1), "party" includes potential litigants).

**17.** Because the amendments to Rule 11 did not become effective until August 2, 1983, Gomberg's conduct at the time of filing the complaint in this action must be judged under preamendment standards. *See In re Ronco,*

*Inc.,* 105 F.R.D. 493 (N.D.Ill.1985). However, Gomberg had an ongoing "duty to assure the legitimacy of his pleadings [which was] not relieved at the time of filing." *Erie Conduit Corp. v. Metropolitan Asphalt Paving Ass'n,* 106 F.R.D. 451, 457 n. 9 (E.D.N.Y.1985).

> Amended Rule 11 provides in pertinent part: The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law....

The Seventh Circuit has held that the language "formed after reasonable inquiry" has in effect changed the standard for finding a violation of the rule from a subjective to an objective one. *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 205 (7th Cir.1985). Under amended Rule 11, a party challenging an attorney's conduct need no longer demonstrate that the attorney acted in bad faith in bringing and pursuing the unfounded claims. *Id.*

based primarily on the inherently unreliable and purchased testimony of Travis. Gomberg and Wagner also knew Travis to be both a financially and emotionally desperate man who was hysterical and whom Gomberg not only believed to be "sick" (Exhibit J at 102), but who had impeached his own credibility. Under these circumstances, according to Lehman, neither Gomberg nor Wagner can be believed when they assert that they filed this complaint under a good faith belief that Travis's allegations against Lehman were true. Second, Gomberg admitted during the December 3, 1982 taped session that he was not concerned about a class action or the rights of any putative class members. Gomberg stated explicitly in the December 3, 1982 taped conversation that he was "not interested in any other customers. I'm interested in Frank." (Exhibit J at 109.) He went on to state: "Well, class action, I don't want to try a class action. It's costly. It takes a—I want to settle." (Exhibit J at 103.) In light of these admissions, Lehman contends that Gomberg could not have made the class allegations in good faith when he filed this complaint as a class action.

Lehman contends that each of these grounds requires that Wagner's complaint be stricken or dismissed under Rule 11. Each of these grounds is also implicated in Lehman's opposition to Wagner's motion for class certification.

Wagner responds that although he "knew that Travis' testimony could not be accepted as truthful on its face, [his] examination of Wagner's personal trading records corroborated Travis' statements regarding the handling of Wagner's account." (Plaintiff's Br. at 53.) He also contends that Gomberg's comments regarding his lack of interest in a class action "obviously were intended only to tell Travis

what he wanted to hear because Travis wanted a quick fix of money." (Plaintiff's Br. at 51–52.) This contention is surprising in light of Wagner's attempted explanation for these damaging admissions that his counsel was not interested in a class action in an earlier brief filed in support of his motion for class certification. There, plaintiff contended that Gomberg disavowed any interest in pursuing a class action because "Travis is a very excitable man, and Mr. Gomberg was physically afraid for himself...." (Plaintiff's Class Br. at 77.)

Regardless of the posited *post* hoc "explanation" for his expressed disloyalty to any class, however, the fact remains that Gomberg contacted Lehman's General Counsel on January 6, 1983 in an attempt to "settle" Wagner's individual claims against Lehman.[18] Gomberg's assertion that he never had Wagner's authority to settle his individual claims against Lehman on January 6, 1983 is absurd in light of the fact that this case had not yet been filed, let alone a class certified. He had no other conceivable reason for contacting Lehman at that time if it was not to attempt to "settle" the case, and he propounds none. In any event, he certainly gave Lehman's General Counsel the impression that he had apparent authority to "settle" the case. This Court can only conclude that Wagner and Gomberg, like Travis, were only after a "quick fix of money" which they thought they could get by contacting Lehman's General Counsel.

This Court has no doubt that Gomberg must be disqualified as counsel for plaintiff for his unethical conduct in violation of DR 7–109(C) and DR 7–104(A). In determining whether a violation of the Code of Professional Responsibility warrants disqualification, "[a] court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical

18. Although Gomberg at most would characterize his contact with Lehman's General Counsel as "settlement negotiations," others might reasonably characterize that contact as extortion or blackmail, particularly in light of Gomberg's assurance to Travis during the December 3, 1982 meeting that Lehman would "settle" in exchange for the tapes because Lehman did not "want anybody to know" and because "as far as [Lehman] can know, these are the only tapes. One set of tapes." (Exhibit J at 109.) This Court need not and does not reach this issue for purposes of this opinion.

conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Woods v. Covington County Bank,* 537 F.2d 804, 810 (5th Cir.1976). Canon 9 of the Code of Professional Responsibility states: "A lawyer should avoid even the appearance of professional impropriety." Any social interest in permitting Gomberg to continue as counsel in this case is limited solely to the preservation of Wagner's right to counsel of his own choice. *See In re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1345 (5th Cir.1981). Any interest Wagner had in retaining Gomberg, however, was rendered nonexistent at the outset when Wagner became aware of and indeed helped orchestrate the financial arrangement with Travis. Gomberg thereafter became involved in the scheme. If Wagner is deprived of counsel of his own choice, it is his own fault for engaging in a scheme to purchase the testimony of a witness whom he later turned upon and sued as a defendant. If ever a case reeked of "the appearance of impropriety," this is the case.

■ For the same reasons, this Court holds that Wagner, or his estate,[19] is not an adequate class representative and that neither Gomberg nor anyone in the Siegan, Barbakoff firm may act as class counsel. An individual seeking class certification must prove that his claims "are typical of the claims … of the class," Fed.R.Civ.P. 23(a)(3), and that "… the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Because a class action judgment would bind absent class members, strict enforcement of both of these requirements is vitally necessary in order to assure "that protection to absent parties which due process requires." *Hansberry v. Lee,* 311 U.S. 32, 45, 61 S.Ct. 115, 120, 85 L.Ed. 22 (1940); *see Moscarelli v. Stamm,* 288 F.Supp. 453, 461 (E.D.N.Y.1968). Class certification would seriously jeopardize the rights of absent class members here because Wagner is subject to unique defenses and because he would not adequately represent the other class members. It is enough to deny class treatment when a defense peculiar to the class representative is even arguably present.[20] Where the proposed representative's credibility is subject to attack, unique defense problems are presented. *See, e.g., Kline v. Wolf,* 88 F.R.D. 696 (S.D.N.Y.1981). *aff'd in part, vacated and remanded in part,* 702 F.2d 400 (2d Cir. 1983). A putative representative's credibility problem could well divert the jury's "attention from the substance of the basic claim" and could severely damage "[t]he remaining class members." *Id.* at 700. A court need not resolve the issue of credibility against the putative class representative in order to bar class certification. It is enough to note the existence of a credibili-

---

**19.** Wagner's death precludes him from serving personally as class representative. Wagner has filed a motion to substitute the executor of his estate, Lee Barbakoff, as class representative. Barbakoff, however, steps into Wagner's shoes, and thus is subject to the same disabilities Wagner had in moving to be approved as class representative. *See Ransom v. Brennan,* 437 F.2d 513, 516 (5th Cir.1971), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). Moreover, Barbakoff suffers from the additional infirmity that he is Gomberg's partner and must be disqualified from representing the class for the same reasons that Gomberg is disqualified.

**20.** *See J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 998–999 (7th Cir. 1980). The rationale for denying class certification where unique defenses are present has been cogently explained by the Seventh Circuit:

> Had this case proceeded as a class action, much of the [representatives'] effort would have necessarily been devoted to [a defense peculiar to them]; this may well have resulted in less attention to the issue which would be controlling for the rest of the class. A representative plaintiff should not be permitted to impose such a disadvantage on the class.

*Koos v. First National Bank of Peoria,* 496 F.2d 1162, 1165 (7th Cir.1974). The Seventh Circuit has also noted:

> The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.

*J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d at 999.

ty problem and its potential adverse impact on the class. *Id.*

■ Wagner's credibility is at issue and is open to serious question. Wagner's relationship with Travis and his conduct leading to this lawsuit, including his purchased agreement with Travis to testify against Lehman in return for a promise of money, inevitably will be a major credibility issue before the trier of fact.[21]

Rule 23(a)(4) further provides that one who seeks to represent a class must "fairly and adequately protect the interests of the class." The putative representative must demonstrate that he will fulfill his fiduciary duty to the class he purports to represent; reason to doubt the ability to meet his fiduciary obligations results in denying class certification. *See, e.g., Kline v. Wolf, supra; Massengill v. Board of Education, Antioch Community High School,* 88 F.R.D. 181 (N.D.Ill.1980) (Crowley, J.); *Folding Cartons, Inc. v. American Can Co.,* 79 F.R.D. 698 (N.D.Ill.1978) (Crowley, J.); cf. *Taub v. Glickman,* 14 Fed.R. Serv.2d (Callaghan) 847 (S.D.N.Y.1970). Wagner, as a fiduciary, owes the putative class a "duty of the finest loyalty." *See Folding Cartons, Inc. v. American Can Co.,* 79 F.R.D. at 703, quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.). Wagner's admission that he induced Travis to testify against Lehman by offering to pay him up to 20% of Wagner's recovery in this case, leads this Court to doubt his ability to adhere to this high standard.

■ The same fiduciary obligations apply as well to counsel seeking to represent the class. Where there is reason to doubt counsel's ability to meet those duties, class certification must be denied. *See, e.g., Kline v. Wolf, supra; Massengill v. Board*

*of Education, Antioch Community High School, supra; Folding Cartons, Inc. v. American Can Co., supra.* Aside from the fact that Wagner and Gomberg allowed Travis to believe that his testimony would be compensated, Gomberg's professed lack of concern for any class action renders him unsuitable as class counsel, regardless of how much time or money he or members of his firm claim to have spent on this case.[22] As early as May 11, 1983, Judge Grady of this Court, to whom this case was then assigned, expressed his concern that Gomberg was apparently not interested in the class:

> [T]he thing that gives me the most concern is your statement about the class on the tapes. It seems to me that that was gratuitous, and it puts the Court in a difficult position.... What you are doing is asking me to go ahead and certify you as a representative for a class, which you have said on a tape recording you care nothing about.

(*See* Tr. of Hearing on May 11, 1983, at 55–56.)

Finally, Gomberg's violation of the ethical disciplinary rules as set forth above bars him from serving as counsel for the class. An inquiry into the character of counsel for the class-representative is also necessary because he stands in a fiduciary relationship with the absent class. *See, e.g., Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3d Cir.1973); *Stavrides v. Mellon National Bank & Trust Co.,* 60 F.R.D. 634, 637 (W.D.Pa.1973). The importance of the attorney's fiduciary duties to the absent class is emphasized by the concern expressed by the *Greenfield* court that:

---

**21.** Moreover, given his extensive investments and his status as a self-made multimillionaire businessman, his repeated characterization of himself as a naive investor also will reflect upon his credibility. However, because of the disposition of the disqualification and class certification motions on grounds set forth in this opinion, the Court need not and does not address the other issues raised by defendants with respect to the class certification motion: *e.g.,* that Wagner

is too sophisticated an investor to act as a class representative.

**22.** Gomberg claims to have "expended hundreds of hours of attorneys' time, reviewed over 5,625 pages of documents and incurred nearly $100,-000 in costs ..." in pursuit of this case. (Plaintiff's Br. at 53–54.)

Experience teaches that it is counsel for the class representatives, and not the named parties, who direct and manage these actions. Every experienced federal judge knows that any statements (sic) to the contrary is sheer sophistry.

483 F.2d at 832 n. 9. In the majority of the reported decisions, examination of counsel's character focuses on his ethical behavior and the attorney's professional responsibility. *See, e.g., Halverson v. Convenient Food Mart, Inc.,* 458 F.2d 927, 931 (7th Cir.1972); *Brame v. Ray Bills Finance Corp.,* 85 F.R.D. 568, 577 (N.D.N.Y. 1979). Reference to counsel's unethical and improper actions is sufficient to find that he cannot adequately represent the putative class in accordance with his fiduciary duties. *See Taub v. Glickman,* 14 Fed.R.Serv.2d 847, 849 (S.D.N.Y.1970) (court denied class certification because of attorney's improper conduct without even finding an actual violation of any disciplinary rule). Gomberg's violation of the canons of ethics requires a finding that he may not represent the class.

Accordingly, Gomberg and the Siegan, Barbakoff firm are disqualified from representing the class; Wagner's motion for class certification is denied; and the motion to substitute Lee Barbakoff, the executor of Wagner's estate, as class plaintiff is denied. The only remaining question is whether to dismiss or strike the complaint as a sham under Rule 11.

■ Although this Court is tempted to dismiss the complaint in its entirety because of the conduct of Wagner and Gomberg at the origin of this lawsuit, the Court will not do so at this time for several reasons. First, all of the case law cited by Lehman in support of the court's authority to dismiss a complaint under Rule 11 predates the August, 1983 amendment of the Rule.[23] Second, as amended, Rule 11 arguably does not permit dismissal with prejudice or striking a complaint as a sham. As

stated in the Notes of the Advisory Committee on Rule 11:

The provision in the original rule for striking pleadings and motions as sham and false has been deleted. The passage has rarely been utilized, and decisions thereunder have tended to confuse the issue of attorney honesty with the merits of the action. See generally Risinger, Honesty in Pleading and its Enforcement: Some "Striking" Problems with Fed.R.Civ.P. 11, 61 Minn.L.Rev. 1 (1976). Motions under this provision generally present issues better dealt with under Rules 8, 12, or 56. See *Murchison v. Kirby,* 27 F.R.D. 14 (S.D.N.Y.1961); 5 Wright & Miller, Federal Practice and Procedure: Civil § 1334 (1969).

Although Gomberg's (and Wagner's) conduct in filing this complaint must be judged by pre-amendment standards, the remedy for violating Rule 11 must be appropriate under Rule 11 as it exists today. Third, it is premature at this point for the Court to inquire into the merits of Wagner's individual claims of churning and unsuitability. Despite the fact that Travis's testimony is virtually worthless because of his credibility problems and because it is self-contradicting, Wagner contends that Gomberg's review of Travis's trading of his accounts at Lehman substantiates his claims. Lehman's argument that this contention is not correct only emphasizes that this question is one of fact which the Court may not reach on these motions. Moreover, Wagner stopped dealing with Travis only after he lost over $1 million. Accordingly, his claim may have some merit, and this Court will not deprive his estate of the right to pursue his claim if it does and if the estate so desires.

Thus, the Court directs the estate of Wagner to determine whether to proceed with this litigation and how to proceed given the fact that Lee Barbakoff may not be substituted as Wagner's executor in this case and given the fact that new counsel

---

**23.** *See, e.g., Ellingson v. Burlington Northern, Inc.,* 653 F.2d 1327, 1329–30 (9th Cir 1981); *Loctite Corp. v. Fel-Pro, Inc.,* 94 F.R.D. 1, 10 (N.D.Ill.1980), *aff'd in part and remanded in part,* 667 F.2d 577 (7th Cir.1981); *Freeman v. Kirby,* 27 F.R.D. 395 (S.D.N.Y.1961).

must be obtained to represent the estate. Assuming that the estate wishes to proceed with the litigation, it is granted 30 days to file an amended complaint in which all class allegations are deleted.

Nonetheless, the Court must emphasize that enough is enough in this litigation. Should the Court determine at any point that there is no merit to the allegations of the Amended Complaint if one is filed, not only will the complaint be dismissed with prejudice, the Court will impose attorneys' fees and costs as a sanction.

II. *Kane's Involvement in the SEC Inquiry in this Matter Requires Disqualification.*

This Court has deduced three principal conclusions from Kane's conduct: despite the fact that Ronald Kane had responsibility for and was involved in the SEC's inquiry into this matter, MC–303, while he was Assistant Regional Administrator of the Chicago Regional Office of the SEC, he proceeded to file his appearance in this case on behalf of Wagner just three days after he left the SEC; despite the fact that Gomberg knew or should have known of the SEC's investigation of defendants, neither he nor Kane bothered to inform the defendants or this Court of Kane's employment by the SEC or took any steps to avoid any conflict of interest even after Kane clearly was made aware of the extent of his involvement in MC–303 other than to unilaterally decide amongst themselves that there was no conflict; and despite his continued representation of Wagner in this case, Kane proceeded to contact his friends and former colleagues at the SEC in an attempt to persuade them to investigate the alleged misconduct of defendant Travis at his then employer, D.H. Blair, regarding

his alleged use of the very same nominee accounts at D.H. Blair that Travis purportedly used while at Lehman to manipulate the market.

Kane's response, quite simply, is that he had so little involvement in MC–303, and it was such an insignificant informal inquiry, that he did not even remember it. He disavows that he had any responsibility, official or otherwise, for MC–303. Kane points out that Joyce Glynn, the branch chief under Kane who supervised the work of the SEC staff attorney, and Tom Huber, who actually conducted the inquiry, testified that Kane did not participate in any aspect of the inquiry except for the two case reviews. Neither Glynn nor Huber nor anyone who participated in these case reviews had any recollection of what was discussed or of how long they lasted, although Kane concludes that they could not have lasted for more than five minutes.

Unfortunately for Mr. Kane, however, the SEC itself has acknowledged that, at least for purposes of the application of 18 U.S.C. § 207 and Rule 8 of the SEC's Conduct Regulation, which will be discussed further below, Kane had both "official responsibility" for and "personal and substantial participation" in MC–303.[24] (SEC Memo. at 12–13.) Moreover, although the Regional Administrator of the CRO of the SEC, William Goldsberry, did not directly testify that Kane had responsibility for MC–303, that conclusion is inescapable from his testimony. Most importantly, Kane himself does not deny that he officially supervised MC–303. Instead, he argues that his level of involvement in MC–303 did not rise to the level of "personal and substantial" responsibility that is required under DR 9–101(B) as set forth in the Rule

**24.** During the evidentiary hearing in December, 1985, this Court requested that the SEC provide its views concerning Lehman's motion to disqualify Ronald Kane. In doing so, this Court was guided by the similar request of the court in *Securities Investor Protection Corp. v. Vigman,* 587 F.Supp. 1358 (C.D.Cal.1984). The Commission considered the request and authorized the Ethics Counsel to present the Commission's views to the Court. On March 3, 1986, the

Commission submitted a memorandum setting forth its views on the applicability of 18 U.S.C. § 207 and Rule 8 of the Commission's Conduct Regulation. For unknown reasons, the Commission did not address the applicability of the disciplinary rules of the Code of Professional Responsibility, despite the Court's request. The SEC's memorandum submitted on March 3, 1986 will be referred to in this opinion as "SEC Memo."

itself and by ABA Formal Opinion 342. DR 9–101(B) reads as follows: [25]

A lawyer shall not accept private employment in a matter in which he had *substantial responsibility* while he was a public employee.

(Emphasis added.) According to ABA Formal Opinion 342, which interprets DR 9–101(B), substantial responsibility is defined as follows:

As used in DR 9–101(B), "substantial responsibility" envisages a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the matter in question. It contemplates a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question.

ABA Formal Opinion 342 (1975) (footnotes omitted). ABA Formal Opinion 342 proceeds to discuss specific examples behind the rule:

Thus, being the chief official in some vast office or organization does not ipso facto give that government official or employee the "substantial responsibility" contemplated by the rule in regard to all the minutiae of facts lodged within that office. Yet it is not necessary that the public employee or official shall have personally and in a substantial manner investigated or passed upon the particular matter, for it is sufficient that he had such a heavy responsibility for the matter in question that it is unlikely he did not become personally and substantially involved in the investigative or deliberative processes regarding that matter. With a responsibility so strong and compelling that he probably became involved in the investigative or decisional processes, a lawyer upon leaving the government service should not represent another in regard to that matter. To do

so would be akin to switching sides, might jeopardize confidential government information, and gives the appearance of professional impropriety in that accepting subsequent employment regarding that same matter creates a suspicion that the lawyer conducted his governmental work in a way to facilitate his own future employment in that matter.

Finally, ABA Formal Opinion 342 lists the purposes of DR 9–101(B):

The policy considerations underlying DR 9–101(B) have been thought to be the following: the treachery of switching sides; the safeguarding of confidential governmental information from future use against the government; the need to discourage government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service; and the professional benefit derived from avoiding the appearance of evil.

These concerns have also been noted by several Circuit Courts of Appeal: *Kessenich v. Commodity Futures Trading Commission,* 684 F.2d 88 (D.C.Cir.1982); *Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979); *Woods v. Covington County Bank,* 537 F.2d 804, 814 (5th Cir.1976).

In *Kessenich, supra,* the District of Columbia Circuit disqualified a former CFTC attorney who had merely reviewed the plaintiff's reparations complaint to ensure that it was complete and that it stated a claim and then forwarded the complaint for further proceedings to the Office of Hearings and Appeals. When he subsequently left the CFTC and sought to represent the defendant, the Court of Appeals disqualified him because of the "appearance of impropriety" standard even though he claimed that he had no specific memory of the case, that his duties were ministerial, that he had no discretion in the matter, and

**25.** Ethical Consideration 9–3 also is relevant: After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists.

that he was not privy to any confidential information. 684 F.2d at 96. The Court determined that an examination of each of the policy considerations underlying DR 9–101(B) revealed that the most concrete danger posed in that case was the appearance of impropriety which may affect the perceived integrity of the agency.

Kane correctly points out that in *Kessenich* the CFTC specifically urged disqualification to protect the integrity of the Commission, whereas in this case the SEC has taken no position whether Kane should be disqualified insofar as DR 9–101(B) is concerned. Although the Court will not speculate as to why the SEC has not taken a position despite this Court's request that it do so, the Court notes that, while it may have been helpful, the SEC's opinion is not necessary to resolve the issue.[26] Apart from the danger posed to the perceived integrity of the agency, this case also poses a danger to the perceived integrity of the bar and the court system.

Kane's involvement in MC–303 was clearly more extensive than that of the former CFTC attorney in *Kessenich*.[27] Kane had substantial discretion as the second highest ranking SEC lawyer in the CRO on the matter. He participated in two case reviews on MC–303, during one of which he concurred in the decision to close the inquiry. And he had access to any confiden-

tial information disclosed to or generated by the matter.

Both parties devote a great deal of effort to arguing whether Kane actually did or did not "close" MC–303 and whether Kane did or did not receive confidential information during the course of MC–303. As these issues are not crucial to this Court's decision, they will be addressed only briefly in this opinion.

As to the first point, it does not matter whether Kane made the "ultimate decision" to close the MC–303 inquiry. The fact is that his own notes reflect that he concurred in the decision to close the inquiry on November 10, 1983. That is sufficient in and of itself to indicate that he substantially and personally participated in the deliberative process necessarily entailed in reaching that decision.

As to the second point, Kane correctly points out that Lehman attempts to transpose to this case the three-step "substantial relationship" analysis that the Seventh Circuit has directed courts to apply to disqualification motions brought against an attorney who undertakes litigation against a former client. Lehman's desire to employ this three-step "substantial relationship" analysis[28] is understandable because it imposes on the attorney who is sought to be disqualified the burden of demonstrating by "clear and convincing" evidence that he did not receive confidential information

**26.** Similarly, although the Court admitted into evidence the opinions of Mr. Huber and Ms. Glynn (*see, e.g.,* Tr., Dec. 12, 1985, at 454), the Court placed no weight whatsoever in this testimony in deciding that Kane's conduct violated DR 9–101(B). Huber testified that he believed that Kane's conduct might give rise to an "appearance of impropriety" (Huber Tr. at 415(b).) Glynn testified that she thought that "with the information that [Kane] had had some supervision, that Mr. Kane should have brought that to the attention of either the opposing counsel [or] the Court...." (Glynn Tr. at 421.)

**27.** It was also more extensive than that involved in other cases in which former government lawyers have been disqualified. *See e.g., LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983); *Securities Investor Protection Corp. v. Vigman,* 587 F.Supp. 1358 (C.D.Cal. 1984).

**28.** That analysis was succinctly described by the Seventh Circuit in *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir.1983), as follows:

First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make disqualification proper.

during the course of his prior representation: the presumption that he did is all but irrebutable. *See, e.g., Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir.1983); *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263 (7th Cir.1983); *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983); *Kapco Manufacturing Co., Inc. v. C & O Enterprises, Inc., et al.,* 637 F.Supp. 253 (N.D.Ill.1985) (Rovner, J.). This Court hesitates to apply the three-step "substantial relationship" test for two reasons. First, it is unnecessary to do so because this Court finds as a matter of fact that confidential information was disclosed to the SEC during MC–303, and MC–303 itself generated confidential information to which Kane had access.[29] Second, Lehman has failed to convince this Court that good reason exists to apply the three-step "substantial relationship" test to this situation.

■ Lehman argues correctly that every court that has considered the argument that Kane makes here—i.e., that DR 9–101(B) applies only to situations involving the treachery of "switching sides"—has rejected it. *See, e.g., General Motors Corp. v. City of New York,* 501 F.2d 639, 650 (2d Cir.1974); *Securities Investor Protection Corp. v. Vigman,* 587 F.Supp. 1358, 1363–64 (C.D.Cal.1984); *see also Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir.1976); *Handelman v. Weiss,* 368 F.Supp. 258 (S.D.N.Y.1973). Lehman also correctly argues that these cases leave no doubt that DR 9–101(B) applies to facts where, as here, a former government attorney seeks to represent either side in a matter related to a prior government investigation. But Lehman makes an illogical and unsubstantiated leap of reasoning to

conclude that because courts have applied the three-step "substantial relationship" analysis to some situations involving DR 9–101(B), that analysis is applicable to all situations in which DR 9–101(B) is implicated. That is simply not the law, and Lehman has not cited a single case involving a former government attorney who subsequently sought to represent a private party in a case not involving the government in which the three-step "substantial relationship" test was applied.

Instead, courts determine the nature and extent of the former government attorney's involvement in the government investigation and then determine whether the present representation of a party on either side would lead to an "appearance of impropriety" which is not outweighed by the party's right to counsel of his own choice. Courts do not inquire into the nature and extent of confidential information received by the former government attorney, and with good reason: that very inquiry necessarily endangers the confidentiality of the government investigation. Thus, this Court declines to employ the three-step "substantial relationship" test in this case. Rather, the Court will employ the same type of analysis used by courts as in *Kessenich, supra.*

■ In evaluating the "appearance of impropriety" in this case, this Court is concerned, as was the District of Columbia Circuit in *Kessenich,* upon the effect on future agency investigations if potential defendants must wonder whether the agency attorney investigating his case will one day turn out to represent the plaintiff in the case:

> more than five minutes each, again given their inability to recall what was said, this Court can only conclude that confidential information was discussed, particularly because at the second case review, the decision was made to close MC–303. The Seventh Circuit has recognized that significant confidences can be communicated in five minutes or less, without the client having been billed any amount for the service. *See Novo Terapeutisk Laboratorium, A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 189 (7th Cir.), *aff'd en banc,* 206 U.S.P.Q. (BNA) 769 (7th Cir.1979).

**29.** The Court regretfully notes that in any credibility dispute of this nature between Kane and defendants' counsel, the Court finds that defendants' attorneys are more credible. Moreover, Lehman's counsel, David Carden, testified that he disclosed confidential information to Tom Huber during phone conversation with him. Given Huber's inability to recall specific conversations, this Court can only accept Carden's testimony. Kane at all times had access to Huber as his supervisor. Finally, even if Kane's assertion that the two case reviews he conducted with Huber and Glynn on MC–303 lasted no

We agree with the implication that counsel should not be disqualified merely because of a hypothetical possibility that an innocuous violation of the Code might have occurred. The more important consideration, however, is the effect of counsel's conduct on the relevant social interests. In this case there is an appearance of impropriety that has an impact beyond its effect on the immediate parties involved. Public confidence in the CFTC's reparation procedures will be undercut if litigants must fear that the public officials who handle their case may one day oppose them in regard to the same matter. This is true even where there is no apparent advantage for the former official. The enforcement of commodity futures trading laws will suffer if laymen are not candid with the investigating personnel of the agency.

*Kessenich,* 684 F.2d at 98.

More importantly, this Court is concerned that Kane's conduct after he clearly learned of his involvement in MC–303 [30] was the antithesis of candor and forthrightness. Instead of coming forward immediately to inform defendants and this Court of a potential problem, Kane and Gomberg took it upon themselves to decide that there was no problem which warranted the Court's attention. Kane's subsequent conduct in refusing to cooperate with defense counsel once they discovered the potential conflict can most charitably be described as evasive. Indeed, this conduct is self-impeaching to the extent that he denies that he has gained any advantage from his prior involvement in MC–303. Finally, his subsequent contacts with his friends and former colleagues at the SEC in an attempt to interest them in an investigation of Travis's use of the same nominee accounts at D.H. Blair that he allegedly used while employed by Lehman—however technically proper they may have been—only reinforce the conclusion that public confidence in the system may be undermined.

Kane himself admitted that an SEC inquiry into Travis's activities at D.H. Blair would be "helpful" to his case before this Court. But that is precisely the type of help that DR 9–101(B) is designed to prevent, and for good reason. A former public servant simply may not use his "ins" at a public agency to aid a private litigant in a private civil dispute. Even if Kane's contacts with the SEC played no role in instigating the SEC's investigation of Travis's activities at D.H. Blair, the fact is that such an investigation was instigated, and the effect on the public perception is the same. This Court cannot and will not condone such conduct.

Lastly, in evaluating the "appearance of impropriety," this Court notes, without deciding, that Kane's conduct may have violated the Ethics in Government Act, 18 U.S.C. § 207 [31] and Rule 8 of the Commission's Conduct Regulation, 17 C.F.R.

---

**30.** Whitten testified that he discussed the complaint in this case with Kane before Kane left the SEC. Even by Kane's own account, however, Kane learned of his potential conflict no later than November 1, 1984. During his phone conversation with Whitten at that time, Kane told Whitten he would contact the Regional Administrator of the CRO, William Goldsberry, to "play it safe" about any potential conflict (Whitten Tr. at 483). Kane did not bother to do this. Moreover, Kane has not even attempted to explain his failure to inform anyone of his involvement in MC–303 either at trial or in the post-trial briefs submitted in this Court.

**31.** 18 U.S.C. § 207(a) and (b) provide as follows: (a) Whoever, having been an officer or employee of the executive branch of the United States Government of any independent agency of the United States, or of the District of Columbia, including a special Government employee, after his employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, any other person (except the United States), in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person (except the United States) to—

(1) any department, agency, court, court-martial, or any civil, military or naval commission of the United States or the District of Columbia, or any officer or employee thereof, and

(2) in connection with any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest, or other particular matter involving a specific party or parties in which the United States or the District of Columbia is a party or has a direct and substantial interest, and

§ 200.735–8.[32] The SEC has taken the position that "Kane did not violate either Section 207 or Rule 8 because all the prerequisites essential for the applicability of these prohibitions were not present." (SEC Memo. at 16.) The SEC bases this conclusion in principal part on the premise that the United States is not a party nor does it have a direct or substantial interest in this matter. Moreover, the SEC concludes that Section 207 and Rule 8 do not apply to Kane's communications with his former colleagues on the SEC's staff because he did not act in a "representative" capacity in communicating with the government:

> The Commission does not consider the transmission to its staff of factual information concerning possible securities law violations to be an appearance or a communication in a representative capacity before the agency. Indeed, it would be a perversion of the post-employment rules to apply them to situations in which a former staff member wished to provide the staff with information of possible securities law violations. In the extreme, it would prevent a former staff member from communicating information to the staff obtained after leaving the Commission, if he or she had participated personally and substantially in the

matter while on the staff. Therefore, in the Commission's view, Kane's communications to Commission staff of factual information concerning Travis' activities at Blair were neither appearances nor communications proscribed by Section 207.

(SEC Memo. at 14.)

The Court does not necessarily disagree with these conclusions, but it is important to make two points. First, the term "appearance" is defined broadly by the regulations to include the "physical presence before the Commission or its employees in either a formal or informal setting." 17 C.F.R. § 200.735–8(c). Second, the Commission can not and does not know the full extent of the United States government's interest in the matter because investigations by the United States Attorney or the grand jury are secret. Moreover, at least during some of Kane's subsequent contacts with the SEC, the New York Regional Office was indeed formally investigating Travis.

Because it is not necessary to reach the Section 207 and Rule 8 issues to decide these motions,[33] the Court does not do so. They are mentioned in this opinion only because here, as in *Kessenich*, Kane's possible violation of a criminal statute and the

---

(3) in which he participated personally and substantially as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise, while so employed; or
(b) Whoever, (i) having been so employed, within two years after his employment has ceased, knowingly acts as agent or attorney for, or otherwise represents, any other person (except the United States), in any formal or informal appearance before, or, with the intent to influence, makes any oral or written communication on behalf of any other person (except the United States) to, or (ii) having been so employed and as specified in subsection (d) of this section, within two years after his employment has ceased, knowingly represents or aids, counsels, advises, consults, or assists in representing any other person (except the United States) by personal presence at any formal or informal appearance before—
(1) any department, agency, court, court-martial, or any civil, military or naval commission of the United States or the District of

Columbia, or any officer or employee thereof, and
(2) in connection with any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties in which the United States or the District of Columbia is a party or has a direct and substantial interest, and
(3) as to (i), which was actually pending under his official responsibility as an officer or employee within a period of one year prior to the termination of such responsibility, or, as to (ii), in which he participated personally and substantially as an officer or employee....

**32.** Rule 8 of the Commission's Conduct Regulation is the agency's counterpart of 18 U.S.C. § 207.

**33.** Similarly, it is not necessary to consider the application of Model Rule 1.11(a) to this case given this Court's disposition of this motion. The Model Rules were adopted by the ABA on

SEC's Rules, only adds to the "appearance of impropriety."

Wagner's interest in retaining counsel of his choice must be weighed against the societal interest in avoiding the appearance of impropriety. Although Gomberg and Kane have expended much time and money on this matter, Wagner was a wealthy individual, and the potential recovery in this case exceeds $1 million.[34] His estate should have no problem in retaining other counsel if Wagner's claim has merit. This Court concludes that Ronald Kane must be disqualified because of his involvement in MC–303.[35]

One final point is in order. This Court's decision to disqualify Gomberg and Kane is made on two separate and independent grounds based on Gomberg's conduct in instigating this lawsuit and on Kane's conduct in representing Wagner given his prior involvement with the SEC inquiry into this matter. Each alone justifies disqualification not only of the lawyers, but of the entire Siegan, Barbakoff firm.[36] When combined together, this Court concludes that there is no question that the "appearance of impropriety" and indeed the fact of impropriety mandate disqualification.

### CONCLUSION

For the reasons stated above, Lehman's motion to dismiss the case pursuant to Fed. R.Civ.P. 11 is denied; Lehman's motion to disqualify based on Gomberg's conduct in originating this lawsuit is granted; Lehman's motion to disqualify based on Kane's involvement with the SEC inquiry of this case is granted; Wagner's Rule 11 motion for sanctions against Lehman and its counsel is denied; Wagner's motion for class certification is denied; and Wagner's motion for leave to substitute Lee Barbakoff, the executor of his estate, as the party plaintiff is denied.

Wagner's estate is ordered to seek the appointment of a new representative to substitute as party plaintiff and new counsel to represent the estate in this Court, not in any way connected with the Siegan, Barbakoff firm. Wagner's estate is to file an amended complaint deleting the class allegations within thirty days if it can do so consistent with Rule 11. Failure to file an amended complaint within the alloted time period will result in dismissal with prejudice.

It is so ordered.

---

August 2, 1983. Since then, only nine states, not including Illinois, have adopted the Model Rules, and then only with substantial revision.

**34.** Moreover, the expenditure of time, money, and effort would have been substantially less if they had brought the potential conflict to the Court's attention immediately instead of waiting at least 7 months for Lehman to do so.

**35.** For obvious reasons, plaintiff's Rule 11 motion for sanctions grounded on the alleged bad faith of Lehman and its counsel in bringing the motion to disqualify Ronald Kane is denied. Lehman had good grounds for bringing this motion; it also had an obligation to bring it to the Court's attention to preserve the integrity of

the judicial system which Lehman and its counsel admirably fulfilled. Unfortunately, Kane and Gomberg did not.

**36.** Disqualification of Mark Cohen, who also has appeared as counsel for plaintiff, is necessary as well because Mr. Cohen has participated in plaintiff's prosecution of this action since its inception, Mr. Cohen has had full access to the file on this case, and Mr. Cohen has met with Kane and Gomberg from time to time to discuss this case. Plaintiff does not assert that Mr. Cohen may continue to represent him even if Kane and Gomberg are disqualified.